IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 15-48

Filed: 5 April 2016

Wake County, No. 12 CVS 14344

LAWRENCE PIAZZA and SALVATORE LAMPURI, Plaintiffs,

v.

DAVID KIRKBRIDE, GREGORY BRANNON, and ROBERT RICE, Defendants.

Following a trial by jury in Wake County Superior Court with Judge G. Bryan Collins presiding, Defendant-Appellant Gregory Brannon appeals from a 13 March 2014 final judgment awarding monetary damages and order awarding attorney fees and costs, and a 11 April 2014 order denying Brannon's motion for judgment notwithstanding the verdict or in the alternative a new trial. Heard in the Court of Appeals 12 August 2015.

*Poyner Spruill LLP, by Steven B. Epstein & Andrew H. Erteschik Attorney for Plaintiff-Appellees.*

*Smith Moore Leatherwood, LLP, by Matthew Nis Leerberg & Mark A. Finkelstein, and The Law Office of Michael Lee Frazier, by Michael Lee Frazier, Attorneys for Defendant-Appellant Gregory Brannon and Defendant-Appellee David Kirkbride.*

HUNTER, JR., Robert N., Judge.

Defendant Gregory Brannon ("Brannon") appeals following a jury verdict finding him liable to Plaintiffs Lawrence Piazza ("Piazza") and Salvatore Lampuri ("Lampuri") (together "Plaintiffs") under the North Carolina Securities Act ("NCSA"),

N.C. Gen. Stat. § 78-56(a)(2). The court awarded monetary damages to Piazza for $150,000.00 and to Lampuri for $100,000.00 plus interest at the legal rate. To this amount the court also assessed attorney fees of $123,804.00 and court costs of $8,493.79. We affirm.

## I. Standard of Review

On appeal, Brannon seeks review of the following legal issues: (1) Whether the Plaintiffs sufficiently pled and proved the statutory elements of NCSA section 78A-56(a)(2) securities fraud including a duty to prove *scienter*? (2) Whether the North Carolina Pattern Jury Instruction detailing the Director Safe Harbor provision, N.C. Gen. Stat. § 55-8-30(b) should have been given? (3) Whether the jury verdict was inconsistent? In the event that this Court reverses any of these legal issues, then Brannon argues he is entitled to a new trial and to have this Court vacate the award of attorney fees and costs.

All Brannon's legal arguments are raised in the context of his Rule 50(a) motion for directed verdict, Rule 60 motion for judgment notwithstanding the verdict, and Rule 59(a) motion for new trial. Each motion is predicated upon similar facts and the similar legal premise that the verdict was "contrary to law." Brannon's appeal suggests that we review his first and second arguments under the *de novo* standard of review and review his third argument for an abuse of discretion. Brannon

contends that all of his arguments should be reviewed under the abuse of discretion standard.

Our analysis of Brannon's appeal leads to the conclusion that all his arguments surround the issue of whether or not the trial court's decisions were "errors of law" which would entitle him to a new trial. We review questions of law *de novo* with the following caveat.

"While an order for new trial pursuant to Rule 59 which satisfies the procedural requirements of the Rule may ordinarily be reversed on appeal only in the event of 'a manifest abuse of discretion,' when the trial court grants or denies a new trial 'due to some error of law,' then its decision is fully reviewable." *Chiltoski v. Drum*, 121 N.C. App. 161, 164, 464 S.E.2d 701, 703 (1995) (quoting *Garrison v. Garrison*, 87 N.C. App. 591, 594, 361 S.E.2d 921, 923 (1987)), *disc. review denied*, 343 N.C. 121, 468 S.E.2d 777 (1996). Our Court has used a similar standard of review when addressing jury instruction issues. "On appeal, this Court considers a jury charge contextually and in its entirety. The charge will be held to be sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. The party asserting error bears the burden of showing that the jury was misled or that the verdict was affected by an omitted instruction. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated

that such error was likely, in light of the entire charge, to mislead the jury." *Hammel v. USF Dugan, Inc.*, 178 N.C. App. 344, 347, 631 S.E.2d 174, 178 (2006) (citations and quotation marks omitted).

With regard to the argument that the verdict was inconsistent, we review the issue under the abuse of discretion standard. When a jury returns a verdict answering several issues, and an irreconcilable repugnance among the issues makes them "so contradictory as to invalidate the judgment, the practice of the Court is to grant a new trial . . . ." *Palmer v. Jennette*, 227 N.C. 377, 379, 42 S.E.2d 345, 347 (1947). However, "[i]t is well settled that a verdict should be liberally and favorably construed with a view of sustaining it, if possible . . ." *Strum v. Greenville Timberline, LLC*, 186 N.C. App. 662, 665, 652 S.E.2d 307, 309 (2007) (quoting *Guy v. Gould*, 202 N.C. 727, 729, 164 S.E. 120, 121 (1932)). "'The trial judge has the discretionary power to set aside a verdict when, in his opinion, it would work injustice to let it stand; and, if no question of law or legal inference is involved in the motion, his action in so doing is no subject to review on appeal in the absence of a clear abuse of discretion.'" *Seaman v. McQueen*, 51 N.C. App. 500, 505, 277 S.E.2d 118, 121 (1981) (quoting *Selph v. Selph*, 267 N.C. 635, 637, 148 S.E.2d 574, 575–76 (1996)).

## II. Facts

### A. Background

Brannon and Piazza first met at Chicago Medical School in 1986. Piazza went on to practice medicine as an ophthalmologist in Maine, and Brannon established his own practice as an OB/GYN in North Carolina. In the early 1990s, Brannon and Piazza invested in a start-up software company, Arckosian Entertainment. Arckosian produced a large online role-playing game, and was founded by Robert Rice ("Rice"), who also served as a president and director for the company. Arckosian closed in 1997, and Rice started several other businesses. During a stint at one company, Z Reality, Rice worked with David Kirkbride ("Kirkbride"), who previously practiced real estate and corporate law in Raleigh, North Carolina.

Brannon met John Cummings ("Cummings") during a medical appointment in 2006, when he served as the prenatal OB/GYN for Cummings's wife. Brannon and Cummings found that they had common interests in investment opportunities, as Cummings had previously worked at an investment group that Brannon had invested in. The two continued to be friends and business acquaintances after Cummings's wife gave birth.

In 2007 Rice and Kirkbride founded Neogence Enterprises ("Neogence"), which Rice described as his "brain child." Neogence developed augmented reality ("AR") applications for smartphones. Augmented reality is a method to display three-dimensional graphics over a video stream, like the yellow first-down line that appears on screen during a televised football game. The augmented reality application that

Neogence developed was called Mirascape. Neogence developed Mirascape to allow smartphone owners to use their phone's camera to scan different areas around them, which would uncover social media posts, photos, restaurant reviews, and other information that would appear on the smartphone's screen.

Rice served as the CEO of Neogence, and focused on developing technology and growing funding for the company. Kirkbride helped with fundraising efforts, investing $75,000.00 himself, and sharing multiple responsibilities as Neogence's co-founder. During Neogence's infancy, Rice talked to Brannon about various business challenges, and sought advice and encouragement. Rice talked to Kirkbride about adding Brannon to the Neogence board of directors, and they agreed to add Brannon. Together, Rice, Kirkbride, and Brannon formed Neogence's initial board of directors.

In 2009, Brannon hosted an event at his home to promote Neogence and introduced Cummings to Rice and Kirkbride. A few weeks after the introduction, Rice and Kirkbride talked to Cummings about joining Neogence as an executive, which he did, joining as the Chief Sales Officer.

Brannon raised money by introducing potential Neogence investors to Rice. Neogence received money from "angel investors," and in exchange, issued convertible promissory notes to the investors.[1] These notes set out a specific maturity date, at

---

[1] Black's Law Dictionary defines an "angel investor" as an experienced and successful entrepreneur, professional, or entity, that provides start-up or growth financing to a promising company, often together with advice and contacts. *Black's Law Dictionary* (10th ed. 2014). For SEC

which time the investor could choose to either recoup his money with interest, or convert that value into a percentage of Neogence stock.

One such angel investor was Brannon's medical school friend, Piazza. Brannon called Piazza in January 2010, to tell him about investment opportunities in Neogence. Piazza invested in Neogence in two installments, a $13,900.00 investment on 5 February 2010, and a $36,100.00 investment on 26 February 2010. Piazza received convertible promissory notes for both investments, with each note set to mature on 30 September 2010.

Another angel investor, Lampuri, worked as the vice president of operations at his family-owned construction company. Lampuri and his wife, Kristen, became acquainted with Brannon through his services as an OB/GYN. The couple used Brannon as an OB/GYN during the birth of their first child, and again in February 2010 when Kristen was pregnant with their second child. During prenatal appointments on 17 February 2010 and 16 March 2010, Lampuri accompanied his wife to Brannon's office, and into the examination room. During both examinations, Brannon discussed Neogence investment opportunities with Lampuri, telling him about the company's Mirascape software.

**B. Cummings's 30 April 2010 Meeting in New York City**

---

purposes an angel investor is an "accredited investor" with a high net worth ($1,000,000.00 or more), who can invest with less disclosure than ordinary investors and regularly invests in higher-risk investments. *See* 17 C.F.R. § 230.501(a).

On 29 April 2010, Cummings attended a retirement party in New York City, celebrating a friend's career at McGarry Bowen, an advertising agency whose clients included Verizon Wireless. During the party, Cummings met Joe Roth, a McGarry Bowen account executive. Roth and Cummings set up a meeting for the following day to discuss a potential Neogence-Verizon relationship to make Mirascape Verizon's OEM[2] featured AR application or a potential Neogence-McGarry Bowen relationship to feature Mirascape in a Verizon advertising campaign. At 8:04 pm on 29 April 2010, Cummings emailed Rice telling him about the scheduled meeting. Rice responded that night at 10:19 pm, and sent Cummings presentation materials for the meeting.

The next day Cummings met with Joe Roth, McGarry Bowen account executives assigned to the Verizon account, and an unnamed Verizon marketing employee. Cummings gave a presentation about the Mirascape software and its ongoing development, but did not perform any software demonstrations. The McGarry Bowen account executives stated to Cummings that they would consider Mirascape as part of their upcoming Summer 2010 advertising campaign for Verizon Droid smartphones, if Neogence could develop Mirascape so that it could meet the account executives' expectations. The Verizon employee did not make any suggestions that Mirascape might become a featured or pre-installed application on Verizon smartphones. Afterwards, Cummings discussed the meeting with Rice,

---

[2] The term "OEM" means that the application or software is factory installed on a smartphone, making it a default application.

Brannon, and Kirkbride "many, many, many, many times." He described these

communications as follows:

> I don't recall exactly what I said. I'm sure I explained to them that they were very excited. I was very excited. That if we could come back with a demo, that, you know, we would have a lot of possibilities of what we could do with the company and how great that would be for Neogence. But the priority was to get the app developed. But without the app, none of it would be possible.

The same day, at 4:14 pm, Rice emailed Brannon, Piazza, and others, reporting

on Cummings's meeting at McGarry Bowen. At 5:56 pm, Brannon sent an email to

Piazza, Rice, and others, stating the following:

> Guys John Cummings just had a meeting in NY with Verizon. We need $100–200K ASAP, in 3–4 weeks we go back to Verizon we have an oppurtnity [sic] to be their featured AR. Rob [Rice] is going to send out a summary later today. I know all of you are BUSY!!! I need you to give a few minutes to look at this potential. THANK YOU for your TRUST!! Greg John Cummings xxx-xxx-xxxx Rob Rice xxx-xxx-xxxx

Brannon contacted Rice and told him to call Cummings and to also update Neogence's

investors about the Verizon opportunity. Rice called Cummings, and he told Rice

about the New York meeting, stating a Verizon employee "fortuitously" sat in on the

meeting, and the McGarry Bowen executives were excited about the presentation.

At 7:14 pm, Rice sent a follow-up email to the investors including Piazza, but

not Lampuri. In the email Rice sought, "$200,000 in additional angel funding" and

described "[t]he opportunity here, is to become the feature AR application for Verizon

OEM'd [sic] on all of the Droid smart mobiles and leverage their marketing. . . ." Prior to sending the email, Rice did not speak with anybody from Verizon or McGarry Bowen.

## C. Soliciting Investments

The month following Brannon's and Rice's 30 April 2010 emails, Piazza and Brannon talked on the phone about seventy times, according to Piazza's count. Brannon described the Verizon opportunity, according to Piazza, consistently with his email. During these calls Brannon urged Piazza to call Cummings, and on or about 1 May 2010, Piazza spoke with Cummings, who described to him the Verizon opportunity no differently than Brannon did. Piazza later phoned Kirkbride. According to Piazza, each phone call from Brannon, Kirkbride, and Cummings described the Verizon opportunity in identical terms.

On 3 May 2010, Rice forwarded an email to Piazza, which was originally an email sent from Rice to Cummings, Kirkbride, and Brannon. Rice wrote Piazza, "FYI, I meant to include you on this earlier today when I sent it out . . . ." The forwarded message read:

> This is going to be difficult and ambitious, but definitely doable, providing we secure funding this week. . . . Ideally, I'd like to schedule the presentation/demo on . . . [May] 26/27. . . . I've also got some people lined up that will be ready to go and jump into development, again, waiting on resources in the bank. . . . [W]e are working on getting all of our ducks in a row both for funding follow-ups, business development and setting the stage to rapidly execute and

kick out a bad-ass live demo for Verizon that does the majority of what we are talking about launching in July. Again, provided a funding injection like now.

On 6 May 2010, Rice sent another email to Piazza, giving a rough timeline for developing Mirascape:

The expectation is that the Verizon meeting will be around the 25th or 26th of May, although we are going to see about pushing it off to Friday, June 4th, which will give us a full four weeks. . . . So at the end of the day, I would like to close on $200,000 before the end of the month. . . . We are going to do this. Verizon won't know what hit them.

Following up with Piazza on 11 May 2010, Rice emailed:

[W]e have targeted Friday, June 4th. Has John confirmed this, for meeting and presenting with Verizon . . . [s]o, John and I, or all of us can fly directly to New York City on the redeye Thursday night and present in the early afternoon and return to Raleigh . . . [on] the evening of the 4th.

On 18 May 2010, Rice emailed Kirkbride and Cummings, telling Cummings he needed a target date to present the Mirascape demonstration to Verizon. Rice wrote:

As before, we will meet our goals and milestones but only if everyone stops playing chicken and tying my hands. I'm done arguing, cajoling and reassuring. Let's get some funds in the door today, and then everyone needs to get out of our way so we can release the damn product. I'd like an update this afternoon with Larry's [Piazza's] requested [investment] terms and a reasonable date for Verizon [sic] meeting.

Rice emailed Piazza on 25 May 2010, stating:

I'll do whatever it takes to get you on board. At this point I can't move this company forward without you. Without you investing right now, we are going to lose our

- 11 -

momentum. Development is going to stall, and we are likely going to lose some people that have to deal with economic realities of their own. If this does happen, I'll keep fighting and rebuild, but we will have lost our chance to be a player in the industry this year . . . . It will take me months to recover if we fall apart now. On the other hand, if you invest now, you are effectively breathing new life back into the company and empowering me and us to stop crawling along and start running the race. . . . I can do all of this with your investment this week, and I can deliver. Granted some of the timelines and milestones have shifted and will always continue to shift as we move forward. . . . You know I have been completely open and transparent with you from day one, even to my disadvantage in negotiating. And quite frankly, we're at a crossroads right now. We need your investment and we need it yesterday. Please believe in me and the team. We can't do this without you.

Afterwards, Rice told Kirkbride to "do what you feel is necessary to close" Piazza.

**D. Piazza's and Lampuri's Investments at Issue**

On 26 May 2010, Cummings and Kirkbride flew to Maine and met with Piazza.

On 28 May 2010, Piazza made a third investment of $150,000.00, adding to his two

previous investments of $13,900.00 and $36,100.00.

Contemporaneous with Piazza's $150,000.00 investment, Lampuri learned of

the Verizon opportunity while at a prenatal exam with his wife on 25 May 2010.

Lampuri described the visit:

Well, [it was] just like any other prenatal visit, my wife was on the exam room table. I was sitting in the chair next to it . . . . And she was wearing the gown, if you want to say. . . . And then he [Brannon] proceeded to, you know, do an examination on my wife. Whether it's, you know, putting his hands on her stomach making sure everything looked

> good there, hearing the heartbeat. And as that was going we were having casual conversation . . . . Him and I, you know, how's the company going, such and such. And then . . . he sat down in the other chair. . . . [A]nd he proceeded to have a conversation with me about this exciting new opportunity that Neogence, his company had. . . . And at that moment, he said . . . we've got something really exciting going on, our director of sales just got back from New York City at a meeting. There were Verizon executives there, and they were absolutely blown away by our technology. . . Neogence needed to go back, create this demo, come back and show Verizon, you know, what they've been talking about, what they've been showing about this technology and they're going get OEMed. They're going pre-installed on all Verizon phones.

Lampuri's wife, Kristen, described the appointment the same, stating she was one-hundred-percent certain that Brannon said Neogence "had an opportunity to be featured on Verizon phones directly installed on the phone."

In mid-July 2010, Lampuri went to Neogence's headquarters and met with Cummings, Rice, and Kirkbride. At headquarters, Cummings presented to Lampuri and described the Verizon opportunity the same as Brannon, except for the difference that Brannon did not say the 30 April 2010 meeting took place at an advertising agency. At the meeting, Rice told Lampuri that the Verizon opportunity was real and the funds Neogence was seeking "were to get this demo up and . . . coming to show Verizon." The meeting ended and Lampuri did not invest right away. Instead, Lampuri went back to Neogence headquarters in August 2010, with his father, Tino Lampuri, and his cousin Anthony Lampuri. Cummings gave another presentation about the Verizon opportunity, and Rice reiterated the need for funding to create a

Mirascape demonstration. Thereafter, Lampuri made a $100,000.00 investment on 24 September 2010, in exchange for a convertible promissory note.

**E. The Decline of Neogence**

Neogence's target date to have a Mirascape demonstration ready for Verizon was delayed several times. Growing frustrated in November 2010, Rice emailed Kirkbride, stating:

> I don't even know if there's any OEM opportunity here or not . . . I'll also say that John [Cummings] makes a lot of stuff up or makes large claims for effect or to make a point. I'm not the only one that has noticed this. So my level of trust for anything he says is minimal at best right now.

Neogence never had a follow-up meeting with Verizon after Cummings's 30 April 2010 meeting at McGarry Bowen. Neogence eventually ran out of money and stopped doing business in July 2011.

Subsequently, sometime in 2011, Piazza sued Neogence in an unrelated civil action, in which Cummings gave an affidavit dated 23 April 2012. In that affidavit, Cummings relates facts regarding his meeting with the marketing executives at McGarry Bowen in the following terms:

> During the [30 April 2010 New York] meeting, there was no discussion of Mirascape being bundled or OEM'd [sic] on to DROID smartphones, by me, Joe Roth or the Verizon employee. Similarly, there was no discussion of Mirascape becoming Verizon's feature AR. These topics simply did not come up. At no point in during my employment with Neogence did I discuss these topics with anyone associated with Verizon.

Piazza received the affidavit, and upon reviewing it, learned of the misrepresentations and omissions that based his investment. Shortly thereafter, in May 2012, Piazza called Lampuri and told him the Verizon opportunity was completely false, that in fact, "all Neogence ever had from the beginning was a possible marketing campaign" with McGarry Bowen. After this discovery, litigation followed.

### III. Procedural History

On 10 October 2012, Plaintiffs filed a complaint against Kirkbride, Brannon, and Rice for securities fraud under N.C. Gen. Stat. §§ 78A-8, 78A-56(a) and (c). Plaintiffs' complaint alleged the following: (1) the notes issued to them were securities under the NCSA; (2) Defendants directly and indirectly employed devices, schemes, and artifices to defraud Plaintiffs; (3) Defendants made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances, not misleading; (4) Defendants' false and misleading representations included the representation that Neogence had an existing opportunity with Verizon for Mirascape to become a featured AR application pre-installed on all Verizon Droid smartphones; (5) Defendants knowingly, intentionally, and/or recklessly engaged in fraud and made untrue statements of material fact; (6) Plaintiffs reasonably and justifiably relied upon Defendants' representations; (7) the false representations directly and proximately caused

Piazza's $150,000.00 investment and Lampuri's $100,000.00 investment; and (8) Defendants violated N.C. Gen. Stat. §§ 78A-8, 78A-56(a) and (c).

Predicating these claims were the misrepresentations and omissions made by Brannon, contained in his 30 April 2010 email to Piazza and others, and his direct conversations with Lampuri, all of which claimed Neogence had an existing opportunity to "go back to Verizon . . . to be their featured AR . . . ." application pre-installed on all Verizon Droid smartphones. In their prayer for relief, Plaintiffs sought $150,000.00 for Piazza, $100,000.00 for Lampuri, plus interest, attorney fees, and costs.

Defendants filed motions to dismiss and answers generally denying the allegations of the complaint, filed counterclaims and crossclaims, and asserted affirmative defenses including but not limited to contributory negligence, failure to mitigate damages, failure to show reasonable reliance, unclean hands, waiver and estoppel, and "reserve[ing] the right to serve other affirmative defenses or claims as the evidence in the action warrants." Discovery was conducted on these issues.

Subsequently, Defendants filed summary judgment motions and were heard by Judge Donald W. Stephens on 22 November 2013. Kirkbride asserted there was no material issue of fact, based on the following:

> I. The Representations Allegedly Made by John Cummings, Gregory Brannon and Robert Rice and Allegedly Repeated by Defendant Kirkbride Are Literally True, and Insufficiently Definite to be False or Reasonably

Relied Upon.

II. There Was No Legally Material Misrepresentation of Fact.

III. Plaintiffs Failed to Make any Reasonable Inquiry as to the Basis or Meaning of the Representations.

IV. Defendant Kirkbride Is Absolved as a Matter of Law Because He Repeated the Statements John Cummings Made to Plaintiffs and to Mr. Kirkbride.

Brannon and Rice argued for summary judgment, stating:

1. Plaintiff Piazza was equally or possibly a more sophisticated investor than was either of the Defendants and hence he could not have reasonably relied upon either of them; Plaintiff Lampuri invested long after the "opportunity with Verizon" complained of was an immediate and/or achievable goal and hence his reliance upon either of the Defendants with respect to emails months before his investment is unreasonable as a matter of law.

2. Further, the representations allegedly made by John Cummings, David Kirkbride, Gregory Brannon and Robert Rice were literally true and insufficiently definite to be false or reasonably relied upon as a matter of law.

3. There were no legally material misrepresentations of fact made by either Defendant to the Plaintiffs.

4. Plaintiffs failed to make any reasonable inquiry or perform even minimal due diligence as to the basis or meaning of any alleged representations made to them prior to investing in Neogence.

On 25 November 2013, Judge Stephens, after hearing arguments of counsel and considering the materials submitted to him arising from discovery, granted

summary judgment for Kirkbride, dismissing the claims against him, but denied summary judgment for Brannon and Rice. Piazza initially appealed the order for summary judgment favoring Kirkbride, but later abandoned that appeal. Brannon included the order of summary judgment favoring Kirkbride in his notice of appeal but did not request that this Court reverse this decision. Therefore, lacking such a request on appeal, we are without jurisdiction to consider the summary judgment in favor of Kirkbride.

The case was called for trial on 10 February 2014, in Wake County Superior Court before Judge Collins. At trial, Plaintiffs called the following witnesses: Rice, Piazza, Lampuri, Lampuri's cousin Anthony, Lampuri's wife Kristen, and played Cummings's video deposition for the jury. Cummings's affidavit was also introduced, which stated the following:

> During the [30 April 2010 New York] meeting, there was no discussion of Mirascape being bundled or OEM'd [sic] on to DROID smartphones, by me, Joe Roth or the Verizon employee. Similarly, there was no discussion of Mirascape becoming Verizon's feature AR. These topics simply did not come up. At no point in during my employment with Neogence did I discuss these topics with anyone associated with Verizon.

When questioned about the affidavit, Rice testified that he believed it was false, and Piazza and Lampuri testified that it was inconsistent with the statements Cummings, Kirkbride, Rice, and Brannon made to them about the Verizon opportunity.

After Plaintiffs rested their case, defense counsel made a motion for directed verdict. To support the motion for directed verdict, defense counsel repeated some of the arguments advanced by Defendant's and Kirkbride's motions for summary judgment. First, Defendants argued that it is inequitable to hold Brannon and Rice liable as directors if Kirkbride, the other director, escapes liability. Second, because all Defendants were acting as directors, Brannon and Rice are entitled to a Safe Harbor defense.

Under this theory, defense counsel contends that Cummings told all of the directors that Mirascape would be pre-installed or "OEMed" on Verizon Droid smartphones. "It's my contention that Greg Brannon and Robert Rice did not succeed in their motion for summary judgment at the time because the defendants were arguing they said something different than what David Kirkbride and John Cummings had told them."

The court questioned defense counsel as follows:

> THE COURT: Do you think it's fair to say that Mr. Kirkbride was let out of the case because there was no evidence that he made any representation to either one of these plaintiffs? I haven't heard any evidence that he personally made any representations to anybody.
>
> [DEFENSE COUNSEL]: It's my contention that Mr. Kirkbride was let out of that case because the representations he made were consistent with those made by John Cummings.
>
> THE COURT: Okay. Go ahead.

> [DEFENSE COUNSEL]: Okay. And that's what's different about our case is that they allege that we said something different. What did we say different? We said that it was— we had the opportunity to be a featured AR, preinstalled and OEMed on all Verizon Droid smart phones. That's the only difference. But I think that's what—
>
> THE COURT: And your clients did not say that.
>
> [DEFENSE COUNSEL]: First off, we do deny saying that. . . . But then, ultimately we conclude by virtue of the deposition that you heard from John Cummings, it was definitely true that they did have that opportunity to. And that's what he believed, and that's what they believed. And that, under [N.C. Gen. Stat. §] 55-8-30, there're entitled to a directed verdict because they don't have liability because they reasonably relied on him.

Brannon and Rice argued they were shielded from liability as directors under the Director Safe Harbor statute, N.C. Gen. Stat. § 55-8-30(b), of the North Carolina Business Corporation Act ("Corporation Act") because they relied on Cummings as an officer of Neogence. Judge Collins found that there were factual issues needing jury resolution because Defendants' statutory defense under N.C. Gen. Stat. § 78A-56(a)(2) required them to carry the burden of proof on their "reasonable care" defense to the jury. Then Judge Collins directly stated the following to defenses counsel:

> THE COURT: . . . . But it seems to me that your Chapter 55 defense, if I look at the pattern jury instructions about that defense, one of the elements is that the plaintiffs would have to prove that the defendant failed to act in a manner he reasonably believed to be in the best interest of the corporation, which leads me to believe that that defense is only as to derivative suits against the director by shareholders. How does it apply in this case?

After this discussion, the court denied the motion for directed verdict and the trial proceeded.

Defendants called Kirkbride as their sole witness, and Brannon did not testify. Unlike Rice and Plaintiffs, Kirkbride testified that Cummings's affidavit was consistent with what Cummings told him about the Verizon Opportunity. Kirkbride claimed he learned, "directly from Cummings," that the Verizon opportunity was really an opportunity to go back to McGarry Bowen with a Mirascape demo, which the agency would consider using in their Verizon advertising campaign. On cross-examination, Kirkbride testified that he could not think of any reason why Cummings would tell him one thing about the Verizon opportunity, but tell Brannon and Rice "something else." He further confirmed that Rice and Brannon could have learned what "the Verizon opportunity actually was" by contacting Cummings, like he did.

Defendants rested their case and Plaintiffs put on rebuttal evidence with Piazza, Lampuri, and deposition testimony from Rice and Brannon. Brannon's deposition was read aloud as follows:

> Question: Do you know whether John Cummings actually met with somebody at Verizon?
>
> Answer: He said he did.
>
> Questions: Okay. And you simply took his word for it?
>
> Answer: Yes.
>
> Question: And you took his word for the fact that your

company, Neogence, had an opportunity to become the featured augmented reality on Verizon applications?

Answer: Yes, I did. And that's why my e-mail said Robert [Rice] have [sic] all the details and John have [sic] all the details.

Question: You have no personal idea as to whether any such representation was made to John Cummings by anyone from Verizon?

Answer: No, sir.

The Plaintiffs rested their case and Defendants did not offer any surrebuttal. The court held the charge conference and the parties agreed to use a special verdict form, listing yes/no questions for each defendant. The questions relevant to Brannon were: (1) whether Brannon, in soliciting Piazza, to pay for a security, made a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where Piazza was unaware of the true or omitted facts; (2) whether Brannon, did not know, and in the exercise of reasonable care, could not have known of the untruth or omission in his offer or sale of a security to Piazza; (3) whether Brannon, in soliciting Lampuri, to pay for a security, made a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where Lampuri was unaware of the true or omitted facts; (4) whether Brannon, did not know, and in the exercise of

reasonable care, could not have known of the untruth or omission in his offer or sale of a security to Lampuri.

In the way of jury instructions, defense counsel requested North Carolina Civil Pattern Jury Instruction 807.50, the analogous pattern jury instruction to the Director Safe Harbor statute, N.C. Gen. Stat. § 55-8-30. The court discussed differences between the Director Safe Harbor defense and the NCSA reasonable care defense stating, "Well, my reading of [section] 55[-8-30] will place the burden [of] proof on the plaintiff. And my reading of [section] 78[A-56(c)] puts the burden of proof on you [the Defendants]. . . ." Defense counsel offered to craft a special instruction for the NCSA reasonable care defense, and the court responded: "Well, it seems to me that what you've asked for in your Special Instruction[] . . . [it] is [an] accurate statement of the law as far as the defenses available to you under [section 78A-]56(a)(2). . . . Because it accurately states the burden of proof is on you [the Defendants]." The court denied Defendants' request for N.C.P.I.—Civil 807.50, and defense counsel preserved the issue for appeal. Next, the parties stipulated to a special jury instruction explaining the elements of section 78A-56(a)(2) securities fraud, and the NCSA reasonable care defense available to Brannon—whether he did "not know and in the exercise of reasonable care could not have known of the untruth or omission in his offer or sale of a security to the [Plaintiffs]."

After closing arguments, Judge Collins charged the jury and deliberation began on 17 February 2014. The jury returned a unanimous verdict on 18 February 2014, finding Brannon liable for securities fraud and Rice not liable. Judge Collins read the verdict form, as follows:

> Issue 1: Did defendant Gregory Brannon in soliciting the plaintiff Lawrence Piazza to pay money for a security make a statement which is materially false or misleading or which under the circumstances was materially false or misleading because of the omission of other facts where the plaintiff Lawrence Piazza was unaware of the true or omitted facts? Answer: Yes.
>
> Issue 2. Did the defendant Gregory Brannon not know and in the exercise of reasonable care could not have known of the untruth or omission in his offer or sale of a security to plaintiff Lawrence Piazza? Answer: No.
>
> Issue 3. Did the defendant Gregory Brannon in soliciting the plaintiff Salvatore Lampuri to pay money for a security make a statement which was materially false or misleading or which under the circumstances was materially false or misleading because of the omission of other facts where the plaintiff Salvatore Lampuri was unaware of the true or omitted facts? Answer: Yes.
>
> Issue 4. Did the defendant Gregory Brannon not know and the exercise of reasonable care could not have known of the untruth or omission in his offer or sale of a security to the plaintiff Salvatore Lampuri? Answer: No.
>
> Issue 5. Did the defendant Robert Rice in soliciting the plaintiff Lawrence Piazza to pay money for security make a statement which was materially false or misleading or which under the circumstances was materially false or misleading because of the omission of other facts where the plaintiff Lawrence Piazza was unaware of the true or

omitted facts?  Answer: No.

[Skip issue 6 since issue 5 was answered "No."]

Issue 7. Did the defendant Robert Rice in soliciting the plaintiff Salvatore Lampuri to pay money for a security make a statement which was materially false or misleading or which under the circumstances was materially false or misleading because of the omission of other facts where the plaintiff Salvatore Lampuri was unaware of the true or omitted facts?  Answer: No.

[Skip issue 8 since issue 7 was answered "No."]

On 13 March 2014, Judge Collins entered a final judgment based on the jury's verdict, ordering Brannon to repay $150,000.00 to Piazza, and $100,000.00 to Lampuri.  Judge Collins also awarded Plaintiffs $123,804.00 in attorney fees, $8,493.79 in court costs, and interest on the damages owed by Brannon.

On 17 March 2014, Brannon moved for judgment notwithstanding the verdict and in the alternative for a new trial, pursuant to N.C. R. Civ. Pro. 59.  Brannon made the following contentions in his motion: (1) the verdict for Rice and against Brannon was internally inconsistent because Brannon repeated statements made by Rice; (2) the jury did not receive Brannon's requested instruction N.C.P.I.—Civil 807.50, which instructs on the content of N.C. Gen. Stat. § 55-8-30; (3) Brannon did not make a material representation as a matter of law; (4) the jury instructions did not require Plaintiffs to show reliance, causation, or *scienter*; (5) the judgment grants rescission for a security sale between a third-party director and an investor, not the actual

entity who sold the security and received the money from the sale; (6) Brannon did not receive a fair trial as an active Republican Senatorial Candidate, since the jury contained eight Democrats and zero Republicans; and (7) the cumulative effect of the six previous issues denied Brannon a fair trial.

The parties were heard on Brannon's motion for a new trial on 26 March 2014, and Judge Collins denied the motion on 11 April 2014. Brannon filed his first written notice of appeal on 21 April 2014, and an amended notice of appeal on 5 May 2014. Brannon's amended notice of appeal contests the 13 March 2014 final judgment, the 13 March 2014 order for costs and attorney fees, the order setting the amount of undertaking required to stay execution of the judgment pending appeal, and the order denying Brannon's motion for judgment notwithstanding the verdict.

On appeal, the parties made oral arguments on 12 August 2015 and filed the following motions: Plaintiffs filed a memorandum of additional authority on 27 August 2015; Brannon's counsel filed a motion for leave to submit a supplemental response on 31 August 2015; on 2 September 2015, Plaintiffs filed a response in opposition to Brannon's motion for leave; and lastly, on 14 September 2015, Brannon's counsel filed a memorandum of additional authority. We allow Plaintiffs' memorandum of additional authority, Brannon's supplemental response, and Brannon's memorandum of additional authority.

## IV. Jurisdiction

This appeal arises from a final judgment. Accordingly, this Court has jurisdiction to consider this appeal under N.C. Gen. Stat. § 7A-27(b)(1), and jurisdiction to consider intermediate orders necessarily affecting the judgment under N.C. Gen. Stat. § 1-278. Brannon's notice of appeal was timely made.

We also have subject matter jurisdiction under the NCSA, N.C. Gen. Stat. § 78A-56. In some instances, federal law preempts state securities provisions, namely in antifraud class actions and governance laws for securities registration and reporting.[3] *See* Securities Litigation Uniform Standards Act of 1998 (generally prohibiting state securities fraud claims from being brought as class actions; *see also* National Securities Markets Improvements Act of 1996 (preempting state security registration and reporting requirements, but not preempting state antifraud laws).

The NCSA creates private rights of action that are complementary to federal securities schemes. Therefore, North Carolina courts have jurisdiction to adjudicate claims arising under the NCSA, and such claims are not preempted by federal law. *See Latta v. Rainey*, 202 N.C. App. 587, 689 S.E.2d 898 (2010). Accordingly, this Court has subject matter jurisdiction over this NCSA action.

As we discuss below, the NCSA parallels federal antifraud acts, and therefore, we use federal courts' interpretation of analogous federal actions as persuasive

---

[3] Nonetheless, many states allow securities actions for breach of contract, fraud, and breach of fiduciary duty that are not preempted by federal law. *See* Thomas Lee Hazen, *Treatise on The Law of Securities Regulation* 428 § 8.1[1][E] (6th ed. 2009).

authority. *State v. Davidson*, 131 N.C. App. 276, 282–83, 506 S.E.2d 743, 748 (1998) ("Cases construing the federal rule are instructive when examining our statute.") Therefore, our use of federal case law should not be construed to impose a rule of federal preemption upon NCSA claims.

Currently, there is limited case law regarding the NCSA.[4] We analyze the NCSA and review Brannon's claims as follows: (A) NCSA liability; (B) primary liability basing the jury verdict; (C) defining NCSA securities offerors and sellers; (D) the applicability of the Director Safe Harbor provision of the North Carolina Business Corporation Act; (E) the allegedly inconsistent jury verdict; and (F) attorney fees.

## A. NCSA Liability

Article 7 "Civil Liabilities and Criminal Penalties of The North Carolina Securities Act," imposes securities[5] liability that is "primary" or "secondary." N.C. Gen. Stat. § 78A-56(a)(1)–(2) (imposing primary liability); N.C. Gen. Stat. § 78A-56(c) (imposing secondary liability on "control persons" and persons that "materially aid" in the securities sale). The relevant sections of the NCSA state the following:

> (a) Any person who:
>
> (1) Offers or sells a security in violation of G.S. 78A-8(1),
> 78A-8(3), 78A-10(b), 78A-13, 78A-14, 78A-24, or 78A-36(a),
> or of any rule or order under G.S. 78A-49(d) which requires
> the affirmative approval of sales literature before it is used,
> or of any condition imposed under G.S. 78A-27(d) or 78A-

---

[4] *NNN Durham Office Portfolio 1*, 2013 NCBC 11, at *8, ¶ 39.

[5] Promissory notes that are convertible into stock, like the convertible notes given to Piazza and Lampuri, are securities under the NCSA. N.C. Gen. Stat. § 78A-2(11).

28(g), or

(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if the purchaser no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and interest at the legal rate as provided by G.S. 24-1 from the date of disposition. . . .

(c) (1) Every person who directly or indirectly controls a person liable under subsection (a), (b), or (b1) of this section, every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the sale is also liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

(2) Unless liable under subdivision (1) of this subsection, every employee of a person liable under subsection (a), (b), or (b1) of this section who materially aids in the transaction giving rise to the liability and every other person who materially aids in the transaction giving rise to the liability is also liable jointly and severally with and to the same

> extent as the person if the employee or other person actually knew of the existence of the facts by reason of which the liability is alleged to exist.
>
> (3) There is contribution among the several persons liable under subdivisions (1) and (2) of this subsection as provided among tort-feasors pursuant to Chapter 1B of the General Statutes.

N.C. Gen. Stat. §§ 78A-56(a), 78A-56(c).

The first subsection, N.C. Gen. Stat. § 78A-56(a), imposes primary liability on "any person" who offers or sells a security. If primary liability exists, then secondary liability may be imposed upon "control persons," enumerated in N.C. Gen. Stat. § 78A-56(c)(1), or upon persons not included in section 78A-56(c)(1) who "materially aid[]" in the transaction basing primary liability. N.C. Gen. Stat. § 78A-56(c)(2). The secondarily liable parties are "jointly and severally" liable "to the same extent" as the primarily liable person. N.C. Gen. Stat. § 78A-56(c)(1)–(2). This differentiation matters because a plaintiff bears a higher burden of proof in proving secondary liability for a person outside of section 78A-56(c)(1) who "materially aids" in the transaction.[6]

**B. Primary Liability**

The NCSA contains two antifraud provisions that impose primary liability on "any person" for (1) fraud, or (2) materially false statements or omissions made in connection with an offer or sale of a security. N.C. Gen. Stat. § 78A-56(a).

---

[6] *See NNN Durham Office Portfolio 1*, 2013 NCBC 11, at *11, ¶ 50.

The first provision, N.C. Gen. Stat. § 78A-56(a)(1), imposes liability similar to common law fraud. N.C. Gen. Stat. § 78A-8 prohibits fraud "in connection with the offer, sale or purchase of any security, directly or indirectly." This prohibition is made actionable under N.C. Gen. Stat. § 78A-56(a)(1), which is comparable to federal actions based upon Rule 10b-5 of Section 10(b) of the Securities Act of 1934. *See* 17 C.F.R. 240.10b-5.

Under section 78A-56(a)(1), a plaintiff must include allegations and proof akin to common law fraud claims.[7] For example, a plaintiff must prove *scienter* and justifiable reliance.[8] Once the plaintiff satisfies its *prima facie* case, the defendant cannot raise an affirmative defense based on lack of knowledge.[9] *See* N.C. Gen. Stat. §§ 78A-8, 78A-56(a)(1). In the instant case, Plaintiffs alleged section 78A-56(a)(1) fraud in their complaint, but this subsection is irrelevant to the jury's verdict and our review.

The provision at issue, N.C. Gen. Stat. § 78A-56(a)(2), represents the second provision for primary liability. It provides the following in relevant part:

> Any person who:
>
> (2) Offers or sells a security by means of any untrue

---

[7] *See NNN Durham Office Portfolio 1*, 2013 NCBC 11, at *13, ¶ 61 ("The legislature's intent to follow traditional fraud procedures for claims under § 56(a)(1) is further evidenced by the fact that § 56(a)(1) does not include the affirmative defense allowed by § 56(a)(2) . . . . And, to the extent that § 56(a)(1) should be interpreted on federal precedent pursuant to Rule 10b-5, scienter and justifiable reliance are elements of 10b-5 claims.") (citation omitted).

[8] *NNN Durham Office Portfolio 1*, 2013 NCBC 11, at *13, ¶ 59.

[9] *NNN Durham Office Portfolio 1*, 2013 NCBC 11, at *11, ¶ 51.

statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security . . . .

N.C. Gen. Stat. § 78A-56(a)(2). Unlike section 78A-56(a)(1) fraud claims, section 78A-56(a)(2) claims may proceed forward without proof of fraud, though section 78A-56(a)(2) liability must be based upon "any untrue statement of a material fact or any omission to state a material fact."[10] N.C. Gen. Stat. § 78A-56(a)(2).

Section 78A-56(a)(2) is the state equivalent of a federal section 12(a)(2) claim of the Securities Act of 1933. 15 U.S.C. § 77l(a)(2). The language of section 12(a)(2) was codified in section 410 of the Uniform Securities Act of 1956, which North Carolina first adopted in 1973.[11] AN ACT TO REPEAL CHAPTER 78 OF THE GENERAL STATUTES AND TO CREATE A NEW CHAPTER 78 CONCERNING SECURITIES LAW, ch. 78, sec. 3, 1973 N.C. Sess. Laws 1973-1380. The federal 12(a)(2) action is different from

---

[10] *NNN Durham Office Portfolio 1*, 2013 NCBC 11, at *11, ¶ 51.

[11] The Uniform Securities Act of 1956 has been adopted in whole or part in 37 jurisdictions, including North Carolina. Since 1956, there have been other uniform securities acts, the Revised Uniform Securities Act of 1985 (only adopted by a small minority of states), and the Uniform Securities Act of 2002. The fraud provisions of Uniform Securities Act of 1956 § 410(a)(2), which are analogous to N.C. Gen. Stat. § 78A-56(a)(2) and federal section 12(a)(2) claims, appear in the Uniform Securities Act of 2002 § 509(b).

NCSA 78A-56(a)(2) in that the federal action requires an interstate nexus,[12] and has been construed to impose liability for untrue statements contained in securities prospectuses. *See Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995).

When a plaintiff successfully proves a *prima facie* case under N.C. Gen. Stat. § 78A-56(a)(2), the burden of proof shifts to the defendant to prove that "he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . ." N.C. Gen. Stat. § 78A-56(a)(2).[13] Therefore, if a plaintiff proves a *prima facie* case, a defendant will be liable unless he brings forward evidence to prove that his statement or omission was made with reasonable care, as set out in N.C. Gen. Stat. § 78A-56(a)(2).

Brannon contends this interpretation of the NCSA and the Plaintiffs' theory of liability turn section 78A-56(a)(2) into a strict liability statute because there is no required finding that a defendant act with *scienter*. We disagree, and we need not characterize this statutory framework as "strict liability" to resolve this case.

First, in construing section 78A-56(a)(2), we read its plain meaning. *See Frye Regional Medical Center, Inc. v. Hunt*, 350 N.C. 39, 45, 510 S.E.2d 159, 163 (1999) ("In interpreting a statute, we first look to the plain meaning of the statute."). The statute contains no language which a legislature would normally use to impose a

---

[12] The interstate nexus requires "use of any means or instruments or transportation or communication in interstate commerce or of the mails . . . ." 15 U.S.C. § 77l(a)(2).

[13] *NNN Durham Office Portfolio 1*, 2013 NCBC 11, at *11, ¶ 51.

*scienter* requirement on liability. A statute imposing a *scienter* requirement embraces knowledge and an intent to deceive, manipulate, or defraud. *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988) (citations omitted); *see also Latta*, 202 N.C. App. at 600, 689 S.E.2d at 909 (citations omitted). A *scienter* requirement uses words like willfully, knowingly, intentionally, or recklessly. While there may be circumstances when a court would require *mens rea* to impose a criminal penalty, there is no reason to read such a requirement into the civil penalties of section 78A-56(a)(2). *See* ANTONIN SCALIA & BRYAN A. GARNER, *READING LAW: THE INTERPRETATION OF LEGAL TEXTS* 303 (1st ed. 2012). We also note the analogous federal section 12(a)(2) action does not impose a *scienter* requirement. 15 U.S.C. § 77l(a)(2); *see In re F&M Distributors, Inc. Securities Litigation*, 937 F. Supp. 647, 656 n. 5 (E.D. Mich. 1996) ("In addition, § 12(a)(2) of the 1933 Act does not require proof of scienter . . . ."); *Junker v. Crory*, 650 F.2d 1349, 1359 (5th Cir. 1981); *see also Heck v. Triche*, 775 F.3d 265, 280–81 (5th Cir. 2014) (citations omitted) (comparing a Louisiana state securities fraud claim to the analogous federal 12(a)(2) claim and differentiating it from a federal 10b-5 claim that requires *scienter*).

Historically, a section 78A-56(a)(2) defendant carried the burden of proof to show that he "did not know, and did not act in *reckless disregard* of the untruth or

omission."[14] N.C. Gen. Stat. § 78A-56(a)(2) (1990) (emphasis added). During this era, "reckless disregard" was not defined by statute.[15] Nonetheless, this historic burden clearly indicates the legislature intended to impose liability against defendants for less than intentional conduct.[16] Our Court upheld this fundamental NCSA principle in *Latta*, and held a defendant is not required to act intentionally to commit fraud. *Latta*, 202 N.C. App. 587, 689 S.E.2d 898.

In 1991, our legislature amended the NCSA and expanded section 78A-56(a)(2) liability by changing the defendant's burden of proof from "reckless disregard" to the modern "reasonable care" standard.[17] An Act to Enhance the Enforcement Provisions of the North Carolina Securities Act and the Investment Advisers Act, ch. 78A, sec. 56(a)(2), 1991 N.C. Sess. Laws 1991-456 (also changing the defensive burden against section 78A-56(c) secondary liability from "reckless disregard" to "reasonable care"). The current "reasonable care" standard appears to be more similar to a negligence standard than intentional fraud. Therefore, in light of the NCSA's plain language, legislative history, and comparison to federal section 12(a)(2) claims, we hold that a section 78A-56(a)(2) civil plaintiff need not prove *scienter*. Further, we hold a

---

[14] *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 NCBC 13, at \*12, ¶ 47 (citing N.C. Gen. Stat. § 78A-56(a)(2) (1990)).

[15] *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 NCBC 13, at \*11, ¶ 47.

[16] *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 NCBC 13, at \*12, ¶ 47.

[17] *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 NCBC 13, at \*12, ¶ 47 (citing 1991 N.C. Adv. Legis. Serv. 456 (LexisNexis)).

materially false or misleading statement or omission made in connection with a security offer or sale is actionable even if the person making the statement or omission did not know it was false, so long as the person was negligent under section 78A-56(a)(2) in making the statement or omission.[18]

## C. Securities Offerors and Sellers

On appeal, Brannon questions his legal status as an offeror or seller of securities. Because Brannon did not individually own the securities sold to Plaintiffs, did not transfer title to them, and did not receive payment for the securities, he claims is not an offeror or seller under the NCSA.

The NCSA defines the terms "sale" and "sell" to include "every contract of sale, contract to sell, or disposition of, a security or interest in a security for value." N.C. Gen. Stat. § 78A-2(8)(a). The terms "offer" and "offer to sell" include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." N.C. Gen. Stat. § 78A-2(8)(b). Therefore, the NCSA imposes

---

[18] The approach in our holding has been adopted in NCSA cases before the North Carolina Business Court, and in federal actions before the Federal Circuit Courts of Appeals and the United States Supreme Court, requiring *scienter* in fraud claims but not claims for materially false or misleading statements or omissions. *See Skoog v. Harbert Private Equity Fund, II, LLC,* 2013 NCBC 17; *NNN Durham Office Portfolio 1*, 2013 NCBC 11, at \*63; *Associated Packaging v. Jackson Paper Mfg.*, 2012 NCBC 13; *Venturtech II v. Deloitte Haskins & Sells*, 790 F. Supp. 576, 788 (E.D.N.C. 1992), *affirmed*, *Heritage Capital Corp. v. Deloitte, Haskins & Sells*, 993 F.2d 288 (4th Cir. 1993) (unpublished); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *see also* Hazen, *Treatise on The Law of Securities Regulation* 300 § 7.81[1] ("Section 12(a)(2)'s private right of action for material misrepresentations and omissions does not require *scienter* and thus is not truly based in fraud.").

liability beyond[19] the owner of a security who holds and transfers title to the buyer. *State v. Williams*, 98 N.C. App. 274, 279, 390 S.E.2d 746, 749 (1990); *see also Pinter v. Dahl*, 486 U.S. 622, 642–643 (1988).

In *Williams*, the defendant signed the stock certificate at issue, but never solicited the buyer's investment or met the buyer prior to issuing the security. *Williams*, 98 N.C. App. at 279, 390 S.E.2d at 749. We disagreed with the State's contention that merely signing a stock certificate constitutes a sale under the NCSA. *Id*. at 278, 390 S.E.2d at 748. However, we agreed that the term "sale" should be broadly construed under the NCSA, and looked to the United States Supreme Court for its guidance in *Pinter*. *Id*. at 278-79, 390 S.E.2d at 748-49. As we noted, the *Pinter* Court "placed great emphasis on the *solicitation* of the buyer as the 'most critical stage of the selling transaction.'" *Id*. at 279, 390 S.E.2d at 749 (citing *Pinter*, 486 U.S. at 646) (emphasis in original). Applying principles from *Pinter*, we held that merely signing a stock certificate does not constitute a "sale" under the NCSA. *Id*. (citing *Pinter*, 486 U.S. at 647).

---

[19] The NCSA also extends liability to securities purchasers under N.C. Gen. Stat. § 78A-56(b), although they, unlike sellers or offerors, are not liable for attorneys' fees in a NCSA suit. Therefore, the NCSA "extends liability to anyone who buys or sells securities without completely and accurately disclosing all material information of which he had knowledge or to which he had had reasonable access." *See* RUSSELL M. ROBINSON, II, ROBINSON ON NORTH CAROLINA CORPORATION LAW § 15.04, at 15-10 (7th ed. 2014) (discussing the effect of the 1991 NCSA amendments). This includes "not only insiders such as directors and officers but also tippees and subtippees to whom inside or nonpublic information has been communicated." *Id*.

Our holding in *Williams* remains consistent with the NCSA, which defines "offer" to include a "solicitation of an offer to buy" a security. N.C. Gen. Stat. § 78A-2(8)(b). Therefore, a seller or offeror of a security may be liable under the NCSA even though he does not hold or transfer title to the buyer.

Building upon *Williams* and the principle that solicitation is a defining factor for offerors and sellers, we hold that a defendant does not have to be a securities professional to be liable under the NCSA. Federal courts have provided persuasive authority in section 12(a)(2) actions, holding that persons who are not securities professionals may be held liable. *See Craftmatic Sec. Litig. V. Kraftsow*, 890 F.2d 628 (3d Cir. 1989) ("We adopt the *Pinter* analysis and hold that liability under § 12[a](2) extends not only to those who pass title to the purchaser, but also to those who successfully solicit the purchase, motivated by their own or the securities owner's financial interests.") (citation omitted); *see also Pinter*, 486 U.S. at 645–46. The plain language of NCSA section 78A-56(a)(2) imposes liability on "any person" who is a seller or offeror, not just brokers and other securities professionals. Accordingly, a defendant may be liable as a seller or offeror under the NCSA, even though he did not act or solicit an investment as a securities professional or broker, and did not act with *scienter*.

**D. Director Safe Harbor**

Brannon's next argument is that at the time of the securities sales he was a director of Neogence, and is therefore entitled to the protection of the Director Safe Harbor statute, N.C. Gen. Stat. § 55-8-30(b), of the North Carolina Business Corporation Act as a defense to liability under the NCSA. We disagree. We examine the Director Safe Harbor provision in the following ways: (i) statutory language and applicability to derivative actions; (ii) limitations of Safe Harbor; (iii) federal interpretation of Safe Harbor; and (iv) Brannon's burden as a defendant.

**i. Statutory Language and Applicability to Derivative Actions**

Our statutes (under "Article 8 Directors and Officers" of the Corporation Act) set out the general standard of conduct for directors, and the related Director Safe Harbor provision as follows:

§ 55-8-30 General standards for directors

(a) A director shall discharge his duties as a director, including his duties as a member of a committee:
    (1) In good faith;
    (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
    (3) In a manner he reasonably believes to be in the best interests of the corporation.

(b) In discharging his duties a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:
    (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(2) Legal counsel, public accountants, or other persons as to matters the director reasonably believes are within their professional or expert competence; or
(3) A committee of the board of directors of which he is not a member if the director reasonably believes the committee merits confidence.

(c) A director is not entitled to the benefit of subsection (b) if he has actual knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (b) unwarranted.

(d) A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section. The duties of a director weighing a change of control situation shall not be any different, nor the standard of care any higher, than otherwise provided in this section.

(e) A director's personal liability for monetary damages for breach of a duty as a director may be limited or eliminated only to the extent permitted in G.S. 55-2-02(b)(3), and a director may be entitled to indemnification against liability and expenses pursuant to Part 5 of Article 8 of this Chapter.

N.C. Gen. Stat. § 55-8-30.

Under this statute, "directors of a corporation are required to act in good faith, with due care, and in a manner they reasonably believe to be in the best interests of the corporation." *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) (citing N.C. Gen. Stat. § 55-8-30). When a director breaches one or more of these fiduciary duties, a shareholder may bring a *derivative* action on behalf of the corporation for injury to the corporation. *Id.* at 141, 749 S.E.2d at 268 (citing N.C.

Gen. Stat. § 55-7-40 (2011)) (emphasis added); *see also State ex rel. Long v. ILA Corp.*, 132 N.C. App. 587, 602–03, 513 S.E.2d 812, 822 (1999). In *Green v. Freeman*, our Supreme Court discussed when a shareholder may bring a derivative action against directors for breach of fiduciary duties:

> The general rule is that '[s]hareholders, creditors or guarantors of corporations generally may not bring individual actions to recover what they consider their share of the damages suffered by the corporation.' *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660, 488 S.E.2d 215, 220–21 (1997) (citations and quotation marks omitted). Shareholders may, however, bring a derivative lawsuit against corporate officers and directors, in which case any damages flow back to the corporation, not to the individual shareholders bringing the action. *Rivers v. Wachovia Corp.*, 665 F.3d 610, 614–15 (4th Cir.2011) (citations omitted); see 2 James D. Cox & Thomas Lee Hazen, Cox & Hazen on Corporations § 15.02 (2d ed.2003) [hereinafter Cox & Hazen on Corporations]. Plaintiffs did not bring a derivative suit. Therefore, we examine two exceptions to the general rule: shareholders, creditors and guarantors may bring an individual action against a third party for breach of fiduciary duty when (1) 'the wrongdoer owed [them] a special duty' or (2) they suffered a personal injury 'distinct from the injury sustained by . . . the corporation itself.' *Barger*, 346 N.C. at 659, 661, 488 S.E.2d at 219, 221.

*Id.* at 67 N.C. at 142, 749 S.E.2d at 268. Here, the Plaintiffs' claim is not brought as a derivative action, but is brought because they suffered individual injury distinct from injury sustained by the corporation itself. Plaintiffs' individual injury is for the loss of their investments, resulting from untrue statements of material fact and omissions made in violation of the NCSA.

## ii. Limitations of the Safe Harbor Provision

The Safe Harbor provision of the Corporation Act provides directors *"discharging [their] duties [as] director[s]"* with a defense against derivative claims, but the provision does provide an individual director Safe Harbor defense if he is not acting in his role as a director. N.C. Gen. Stat. § 55-8-30(b) (emphasis added). The plain language of the statute is clear and not ambiguous.

The record suggests Brannon shared fundraising responsibility with other Neogence employees. However, the jury found Brannon liable to Plaintiffs under section 78A-56(a)(2) for his individual representations, which were the product of his own acts, not his directorial responsibilities set out by the board. The Neogence board did not collectively or formally approve a solicitation message and charge Brannon or any directors with the responsibility of repeating it. Nor did Neogence approve Brannon's actions or message before his solicitations. Therefore, even though Brannon was attempting to fundraise, a responsibility he may have shared with other Neogence employees, his acts are not a product of Neogence's collective approval and are not a "business judgment" of the entity.

### iii. Federal Interpretation of the Safe Harbor Provision

Brannon and the Dissent reason the Safe Harbor provision should be applicable due to the Fourth Circuit's holding in *Dellastatious v. Williams*, 242 F.3d 191 (2001). We distinguish *Dellastatious* on several grounds.

In *Dellastatious*, the plaintiffs brought a securities fraud action against two defendants ("Williams" and "Kelly") as "control persons" under the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), and the Virginia Securities Act, Va. Code. § 13.1-522(C).[20] *Dellastatious*, at 192–93. Williams and Kelly were directors of a parent company, LaserVision Technologies, Inc. ("LaserVision"), which served as a managing member of the company at issue, Surround Vision Advanced Imaging, Inc. ("SAIL"). *Id.* at 193. Adrian Gluck ("Gluck"), served as president of LaserVision, and president, CEO, and director of SAIL. *Id.* Gluck invited the plaintiffs to invest in SAIL, and SAIL sent them "offering documents regarding the sale of the SAIL securities." *Id.* These documents were prepared by Gluck, SAIL's Executive Vice President, director, CFO, and LaserVision's attorney. *Id.* Thereafter, plaintiff Dellastatious invested in SAIL. *Id.* Several months later, the documents were revised and updated copies were mailed to Dellastatious. *Id.* Shortly thereafter, SAIL ceased doing business rendering Dellastatious's shares worthless. *Id.*

Dellastatious and another SAIL shareholder sued three of SAIL's officers, LaserVision, and Williams and Kelly as outside directors of LaserVision. *Id.* The alleged fraud centered on the offering documents and "Williams and Kelly, although

---

[20] We note that Va. Code § 13.1-522(C) imposes a "reasonable care" defensive burden on control persons, like N.C. Gen. Stat. § 78A-56(c). However, Virginia, unlike North Carolina, has used this "reasonable care" language since it adopted the Uniform Securities Act of 1956. *See* Va. Code § 13.1-522(b) (1956); *Cf.* An Act to Enhance the Enforcement Provisions of the North Carolina Securities Act and the Investment Advisers Act, ch. 78A, sec. 56(a)(2), 1991 N.C. Sess. Laws 1991-456.

perhaps not directly responsible for the securities fraud, were [allegedly] liable as 'control persons' under Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), and the Virginia Securities Act, Va. Code. § 13.1-522(C)." *Id.* at 194. Williams and Kelly specifically pled the Virginia Safe Harbor statute Va. Code § 13.1-690(B) as an "affirmative defense" to liability. The trial court granted Williams's and Kelly's motion for summary judgment because "they were not control persons" and "they satisfied the statutes' good-faith defense." *Id.* at 193. On appeal, the Fourth Circuit affirmed the district court and held Williams and Kelly "are entitled to the good-faith affirmative defense under both federal law and Virginia's allegedly more-exacting [Safe Harbor] standard." *Id.* at 195.

The Fourth Circuit reasoned, "control persons may escape liability by proving that they acted in good faith with regard to the securities violation. *See* 15 U.S.C. § 78t(a). To determine whether the good-faith affirmative defense has been satisfied under section 20(a), defendants must show that they did not act recklessly." *Id.* at 194. Looking to the control person section of the Virginia Securities Act, the court held the state statute "allows control persons to avoid liability if they can prove that they 'did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.'" *Id.* (citing Va. Code § 13.1-522(C)). "*One way* to determine whether Williams and Kelly acted with 'reasonable care' pursuant to [the Virginia antifraud statute imposing

liability upon control persons] is to consider whether they complied with the duties established for directors under state law." *Id.* at 195 (emphasis added). The court added the following footnote to this consideration:

> While Dellastatious brought several different claims against Williams and Kelly in their different capacities, *all of Dellastatious' claims revolve around Williams and Kelly's roles as directors of LaserVision. The key to Dellastatious' theory is that SAIL is a shell corporation and that LaserVision and its officers are the bad actors.* As a result, we assess the reasonableness of Williams and Kelly's conduct with an eye toward the duties owed by corporate directors.

*Id.* n. 3. (emphasis added).

Citing Virginia's Safe Harbor statute, Va. Code § 13.1-690(B),[21] the court reasoned "as long as directors have no knowledge that makes reliance unwarranted, they may rely on financial statements prepared by corporate officers, legal counsel, or public accountants." *Id.* at 196 (citation omitted). The court continued, "[i]n cases such as this, where shareholders allege that directors have insufficiently supervised the corporation's affairs, directors can avoid liability by showing that they attempted

---

[21] The Virginia Safe Harbor provision provides the following: "A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by: one or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented; legal counsel, public accountants . . .; a committee of the board of directors . . . ." Va. Code 13.1-690(A)–(B). Virginia's safe harbor provision is nearly identical with North Carolina's provision under N.C. Gen. Stat. § 55-8-30(a)–(c).

in good faith to ensure that an adequate corporate information-gathering and reporting system was in in place." *Id.* "It was reasonable for Williams and Kelly to delegate the creation and review of SAIL's offering documents to SAIL's officers . . . and their attorney." *Id.* Further, "SAIL's system for drafting and reviewing offering documents functioned properly." *Id.*

The court held Williams and Kelly were "entitled to the good-faith affirmative defense under both federal law and Virginia's . . . more-exacting standard [for Safe Harbor]" because they "complied with Virginia's standards for directorial duties, and they likewise acted with reasonable care." *Id.* at 195–96.

Despite Brannon's and the Dissent's comparison, *Dellastatious* is markedly different from the case *sub judice*. An affirmative defense, like the Safe Harbor defense pled by Williams and Kelly, may be granted at summary judgment if the record shows the directors had a process of corporate data collection that was reliable and insured verification of facts stated in a prospectus collected by corporate employees, such as accountants and lawyers, upon which a board could reasonably rely.

In this case, Brannon never pled the Safe Harbor affirmative defense in his answer or in his motion for summary judgment. After the evidence was submitted he did not move to amend his pleadings to assert this affirmative defense pursuant to North Carolina Rule of Civil Procedure 15. *See* N.C. Gen. Stat. § 1A-1, Rule 15.

Rather, he raised the Safe Harbor affirmative defense only at directed verdict and again when instructions were to be given to the jury. Under North Carolina Rule of Civil Procedure 8(c), "a party shall affirmatively set forth any matter constituting an avoidance or affirmative defense." *Robinson v. Powell*, 348 N.C. 562, 567, 500 S.E.2d 714, 717 (1998) (citing N.C. Gen. Stat. § 1A-1, Rule 8(c)). "[I]t is well-established that failure to plead an affirmative defense constitutes a waiver of the defense." *Ellison v. Gambill Oil Co., Inc.*, 186 N.C. App. 167, 174, 650 S.E.2d 819, 823 (2007) (citations omitted). After careful review of the record, Brannon does not plead the Safe Harbor affirmative defense or cite to N.C. Gen. Stat. § 55-8-30 in any of his pretrial pleadings. Therefore, even if the defense were available, which it is not, he waived the Safe Harbor affirmative defense. Due to the notice requirement of Rule 8(c), it would offend equity to grant Brannon this waived affirmative defense. *See* N.C. Gen. Stat. § 1A-1, Rule 8(c) ("Such pleading shall contain a short and plain statement of any matter constituting an avoidance or affirmative defense sufficiently particular to give the court and the parties notice . . . .").

After comparing the instant case to *Dellastatious*, we note the following distinctions. First, Williams and Kelly faced liability as control persons for failing to supervise corporate affairs, not primary liability as securities offerors or sellers like Brannon. Second, the misrepresentations in *Dellastatious* were contained in securities offering documents, provided by SAIL, and drafted and reviewed by SAIL's

officers, directors, and legal counsel. In contrast, Brannon made direct misrepresentations to Plaintiffs while soliciting their investments through verbal and written means. Third, the control person claims in *Dellastatious* "revolve[d] around Williams and Kelly's roles as directors of LaserVision." *Id.* at 195, n. 3. In contrast, Brannon, or "*[a]ny person* who offers or sells a security by means of *any untrue statement* of a material fact or *any omission* to state a material fact . . ." faces liability under N.C. Gen. Stat. § 78A-56(a)(2) (emphasis added). Plaintiffs do not allege Neogence made materially false misrepresentations in offering documents or prospectuses, or that such misrepresentations were collectively and formally approved by Neogence's board. Rather, Plaintiffs allege Brannon's rogue solicitations were materially false, and he made the solicitations as a seller or offeror, thereby bringing him within the broad class of "any person" subject to primary liability under N.C. Gen. Stat. § 78A-56(a).

We also note that *Dellastatious* does not resolve the Uniform Model Securities Act of 1956 § 410(a)(2)[22] (which North Carolina adopted and codified verbatim in the modern version of N.C. Gen. Stat. § 78A-56(a)(2)) with Director Safe Harbor protection.[23] After careful review, we can identify no state case that affords Director

---

[22] Or the equivalent under Uniform Securities Act of 2002 § 509(b).

[23] *See Atocha Ltd. Partnership v. Witness Tree, LLC*, 65 Va. Cir. 213 (2004) (not reported in S.E.2d); *Premier Capital Management, LLC v. Cohen*, 2008 WL 4378300 (N.D. Ill. 2008) (not reported in F.Supp.2d); *Poth v. Russey*, 281 F.Supp.2d 814 (E.D.Va. 2003); *Frank v. Dana Corp.*, 646 F.3d 954

Safe Harbor protection to a seller or offeror who is alleged to be primarily liable for his individual actions under a state antifraud statute.[24]  The only cases that afford such protection are those in which defendants are alleged to be control persons, like Williams and Kelly in *Dellastatious*.[25]  Even in control person cases, directors carry the burden in establishing their reasonable care.[26]

The Safe Harbor provision, as applied in control person cases, protects plural directors for their corporate mismanagement.  As discussed, Brannon acted individually and touted securities based upon inside information.  Therefore, the

---

(6th Cir. 2011) (adopting the good faith defense in federal Section 20(a) claims, arising under 15 U.S.C. § 78t(a), for allegations against control persons).

[24] *See Everts v. Holtmann*, 64 Or.App. 145, 155–56, 667 P.2d 1028, 1035 (1983) ("We conclude that [defendant's] statement in his affidavit that he relied on information received from [business's] accountant and active officer and directors is insufficient to immunize him as a matter of law. . . . [Defendant] contends finally, that as an "outside" director without notice of any suspicious activity, he should not be held liable for the acts of active officers and directors.  Those factors go into the mix of facts to be presented to the trier of fact to determine what constitutes reasonable care here, but they do not, as a matter of law, support summary judgment for [defendant].").

[25] *See* the following federal Section 20(a) cases: *Senior Management, Inc. v. Arnett Group, LLC*, 2013 WL 3245328 (E.D.N.C. 2013) ("As [defendant] has not provided any evidence that he acted in good faith, he may not escape derivative liability as a controlling person here." (citing *Dellastatious*, 242 F.3d at 194)); *Karmen v. Lindly*, 94 Cal. App. 4th 197, 114 Cal.Rptr.2d 127 (2001); *Laperriere v. Vesta Ins. Group, Inc.,* 526 F.3d 715, 721 (11th Cir.2008); *In re Stone & Webster, Inc., Sec. Litig.,* 424 F.3d 24, 26 (1st Cir.2005); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 384 n. 19 (5th Cir.2004); *Donohoe v. Consol. Operating & Prod. Corp.,* 30 F.3d 907, 912 (7th Cir.1994).

[26] *See Hines v. Data Line Systems, Inc.*, 114 Wash.2d 127, 146, 797 P.2d 8, 18 (1990) ("Defendants argue . . . [the Washington State Securities Act] does not impose upon directors a duty to investigate facts beyond their *actual* knowledge.  However, the plain language of the affirmative defense provision requires something more than actual knowledge.  The defense is available only if such person 'did not know' and 'could not have known' of the existence of the liability producing facts. Ignorance will be bliss only to the extent that the director can prove that even by the exercise of reasonable care he would have remained ignorant of the true state of affairs.") (citation omitted) (emphasis in original).

Director Safe Harbor provision cannot readily immunize Brannon from his individual actions.

### iv. Brannon's Burden as a Defendant

In the way of attempting to carry a Safe Harbor burden, Brannon testified through his deposition, that he "simply took [Cummings']" word at face value. He offered no evidence that he reasonably believed Cummings was reliable and competent, he offered no evidence of good faith or reasonable inquiry, and he offered no evidence that he "actually read and considered any material [from Cummings] . . . [and did] not ignore anything that would cause doubts about the reliance."[27]

More germane to his NCSA primary liability and statutory reasonable care defense, Brannon offered no evidence that he "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission" contained in his solicitations. N.C. Gen. Stat. § 78A-56(a)(2). Brannon offered no evidence to show that his inaction following the solicitations was reasonable. Brannon's blind faith and willful ignorance is juxtaposed by Kirkbride's testimony and Rice's incredulity towards Cummings. As Kirkbride testified, Brannon could have contacted Cummings and learned the truth of the Verizon opportunity. Therefore, Brannon did

---

[27] RUSSELL M. ROBINSON, II, *ROBINSON ON NORTH CAROLINA CORPORATION LAW* § 14.05, at 14-16 (7th ed. 2014).

not carry the burden[28] of his NCSA reasonable defense, nor any Safe Harbor defense he seeks on appeal.

We respectfully disagree with the Dissent and hold the Director Safe Harbor provision does not supersede, narrow, or aggrandize the statutory reasonable care defense available to "any person" under N.C. Gen. Stat. § 78A-56(a)(2). As such, we hold the trial court did not commit an error of law regarding the motion for directed verdict or jury instructions.

## E. Inconsistent Jury Verdict

Brannon next complains it is inconsistent for him to be held liable under the NCSA when Kirkbride and Rice were not held liable. Because a jury may apply the law to the facts, it is not illogical or inconsistent for two NCSA defendants to achieve different results in a single action. If one defendant carries his reasonable care burden of proof and the other does not, the jury's verdict can properly impose liability on the latter but not the former. The issue of a defendant's reasonable care is a factual question for the jury to consider. "It is the jury's function to weigh the evidence and to determine the credibility of witnesses . . . and the trial court should set aside a jury verdict only in those exceptional situations where the verdict . . . will result in a miscarriage of justice." *Strum*, 186 N.C. App. at 667, 652 S.E.2d at 310

---

[28] We explicitly note the burden of proof shifted to Brannon to prove his reasonable care defense after Plaintiffs established their *prima facie* case for primary liability under N.C. Gen. Stat. § 78A-56(a)(2).

(citations and quotation marks omitted). A jury verdict imposing liability on one of two defendants in an action is not a "miscarriage of justice" when one defendant testifies to the benefit of his reasonable care defense and the other defendant remains silent and fails to carry his burden. As such, the trial court did not abuse its discretion in refusing to set aside the jury verdict, enter a judgment notwithstanding the verdict, or grant a new trial.

In this case, Cummings was the only party present at the 30 April 2010 New York meeting. His account of the meeting roots all controversy among the Defendants, and the misleading information they relayed to investors. Cummings's testimony was presented to the jury through his 23 April 2012 affidavit and his 13 September 2013 deposition.

In his affidavit, Cummings testified as follows:

> The focus of the April 30, 2010 meeting . . . at McGarry Bowen was to discuss Mirascape's mobile phone technology and a forthcoming advertising campaign McGarry Bowen and Verizon were planning . . . . [Joe Roth] asked me to came [sic] back (in July [2010] if possible) when Mirascape had a demo, once I returned and demonstrated a functioning app, he would consider Mirascape being used in Verizon's forthcoming advertising campaign. During the above-described meeting, there was no discussion of Mirascape being bundled or OEM'd [sic] onto DROID smartphones, by me, Joe Roth, or the Verizon employee. Similarly, there was no discussion of Mirascape becoming Verizon's featured AR. These topics simply did not come up. At no point in time during my employment with Neogence did I discuss these topics with anyone associated with Verizon.

Rice, Piazza, and Lampuri testified that Cummings's affidavit was false and inconsistent with their communications with Cummings, Kirkbride, Rice, and Brannon. To the contrary, Kirkbride testified that Cummings's affidavit was consistent with his knowledge of the Verizon opportunity.

In his deposition, Cummings testified that during the New York meeting, "McGarry Bowen was in no position to make a relationship between Verizon and Neogence." He discussed an advertising campaign with one of the McGarry Bowen account managers, and brainstormed, but nothing "more serious than that." If Neogence could fully develop the Mirascape app in time, "they would consider it as part of" an advertising campaign. Pressed to define "they" as either McGarry Bowen or Verizon, Cummings testified "I would assume it would be both. I don't know that." According to Cummings, the Verizon employee at the meeting did not suggest "in any way, shape, or form . . . that Mirascape might have an opportunity to become a featured application on Verizon smart phones [sic]" or "have an opportunity to become OEM or pre-installed on Verizon smart phones [sic]." Cummings confirmed "there was no specific opportunity presented to [him] that day, other than the opportunity to come back and show a functioning demo." The emails Rice and Brannon sent to investors certainly suggested a more promising opportunity, that Neogence would "go back to Verizon" to demonstrate Mirascape, and possibly become OEMed on Verizon smartphones as a featured AR application.

Cummings reviewed Brannon's email and testified that it "overstated" the Verizon opportunity because the opportunity was for Neogence to return to McGarry Bowen, not Verizon, to perform a demonstration and hopefully become part of an advertising campaign, not become Verizon's feature or OEM AR application. Cummings stated Rice's email "could be misleading" because it described the opportunity as Brannon described it, and such a "portrayal of the meeting" would not be accurate "without clarification."

The Plaintiffs contend Defendants made false and misleading representations about the Verizon opportunity, specifically citing "the representation that Neogence had an existing opportunity with Verizon for Mirascape to become a featured AR application pre-installed on all Verizon DROID smartphones." Defendants, excluding Kirkbride, contend they learned and relayed this misleading information from Cummings. Therefore, liability in this case depends upon the action defendants took to investigate the Verizon opportunity.

Kirkbride participated in soliciting investments, but there is no evidence that he relayed misleading statements about the Verizon opportunity to Plaintiffs. Kirkbride testified he exercised reasonable care by speaking to Cummings directly, and learned the Verizon opportunity was actually a McGarry Bowen advertising opportunity.

Rice relayed misleading information in his 30 April 2010 email to Piazza and other investors He also misled Lampuri in a July 2010 meeting, stating the Verizon opportunity was "very much real" and investment funds would be used to create a Mirascape demonstration for Verizon. However, Rice rectified his statements by emailing Piazza and keeping him abreast of ongoing challenges and deadlines. He also emailed Kirkbride, which stated the following for the jury:

> The problems are [sic] John [Cummings], who I have to keep covering for in phone calls, meetings, and e-mails. I've constantly had to go in behind him and clean things up, clarify things, or reset expectations. . . . Verizon is nice, but it turned into something that has almost cost us Larry [Piazza] because it was oversold on too short of a timeline . . . . do not breathe a word of this to Larry [Piazza]. It will show a total lack of confidence in the company and me . . . . If you decide you have to, to close him, then fine. . . . [I]f it comes to it, I'd rather you bring it up.
>
> I don't even know if there's any OEM opportunity here or not . . . I'll have to say that John [Cummings] makes a lot of stuff up or makes large claims for effect or to make a point. I'm not the only one that has noticed this. So my level of trust for anything he says is minimal at best right now.

In contrast, the evidence against Brannon appears one-sided. The jury considered Brannon's misleading solicitations in his 30 April 2010 email to Piazza and others, claiming that Cummings had a meeting "with Verizon" and "in 3–4 weeks we go back to Verizon we have an oppurtnity [sic] to be their featured AR." The jury heard these same misrepresentations repeated to Lampuri, when he was in the

prenatal examination room with his wife Kristen. Brannon presented no evidence suggesting he remedied or clarified these solicitations. Rather, as Brannon sat silent, Plaintiffs read portions of Brannon's deposition to the jury. In these excerpts, Brannon admitted to relaying the faulty information to investors without any personal knowledge of the Verizon opportunity, and without contacting Cummings, McGarry Bowen, or Verizon to clarify the business opportunity. Due to this inaction, it was reasonable for the jury to find Brannon did not exercise reasonable care, and find him liable to Piazza and Lampuri. Therefore, the trial court's judgment and rulings are not based upon errors of law, and the trial did not abuse its discretion in not setting aside the jury verdict.

**F. Attorney Fees**

Lastly, we review the issue of attorney fees and costs. A trial court's decision to award or deny attorney fees "will not be disturbed on appeal unless the trial court has abused its discretion." *Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 528, 586 S.E.2d 507, 513 (2003). Given the trial court's proper rulings, we hold the court did not abuse its discretion in awarding attorney fees and costs to Plaintiffs.

## V. Conclusion

For the foregoing reasons, we affirm the trial court.

AFFIRMED.

Chief Judge MCGEE  concurs.

Judge TYSON concurs in part, dissents in part.

No. COA15-48 – *Piazza v. Kirkbride*

TYSON, Judge, concurring in part, dissenting in part.

The statutory Director Safe Harbor set forth in N.C. Gen. Stat. § 55-8-30(d) is a necessary protection for directors due to "the growing complexity of business affairs," which makes it "necessary for [outside] directors to rely on other corporate personnel" and "outside experts in discharging their responsibilities." RUSSELL M. ROBINSON, II, ROBINSON ON NORTH CAROLINA CORPORATION LAW § 14.05 (7th ed. 2014). The "business judgment rule protects corporate directors from being judicially second-guessed when [directors] exercise reasonable care and business judgment." *HAJMM Co. v. House of Raeford Farms, Inc.* 94 N.C. App. 1, 10, 379 S.E.2d 868, 873, *modified and aff'd in part, rev'd in part on other grounds*, 328 N.C. 578, 403 S.E.2d 483 (1991). The trial court's rulings and the majority's opinion deny Brannon his legal entitlement to a Director Safe Harbor instruction to the jury where the evidence clearly supports it.

The trial court erred by failing to instruct the jury on the Director Safe Harbor provision as Brannon requested in light of the evidence presented. I vote to award Brannon a new trial based upon the trial court's failure to provide the jury with the requested instruction as supported by the evidence.

I also respectfully disagree with the portion of the majority's opinion, which holds the verdicts were not inconsistent with regard to the statements Brannon, Rice,

and others made to Piazza. To deem Brannon's statements to Piazza as "securities fraud," while acquitting Rice, the Chief Executive, is extreme, legally unsound, and patently illogical. Brannon is entitled to a new trial because the verdict, which holds him liable to Piazza, is wholly inconsistent with the verdict absolving Rice from liability to Piazza upon identical conduct.

I respectfully dissent from the majority opinion's holdings that the Director Safe Harbor defense set forth in the North Carolina Business Corporation Act, N.C. Gen. Stat. § 55-8-30(d), is inapplicable, and that the trial court properly denied Brannon's motion for a new trial for inconsistent jury verdicts regarding his liability to Piazza.

## I. Director Safe Harbor Provision

Brannon is entitled to a new trial after the trial court failed to give the applicable jury instruction on the Director Safe Harbor provision set forth in N.C. Gen. Stat. § 55-8-30(d). Brannon's request is supported by the evidence in the record.

## A. Standard of Review

> When reviewing the refusal of a trial court to give certain instructions requested by a party to the jury, this Court must decide whether the evidence presented at trial was sufficient to support a reasonable inference by the jury of the elements of the claim. If the instruction is supported by such evidence, the trial court's failure to give the instruction is reversible error. Thus, the appropriate inquiry here is whether evidence existed to support the request for an instruction.

2

*TYSON, J., concurring in part, dissenting in part.*

*Ellison v. Gambill Oil Co., Inc.*, 186 N.C. App. 167, 169, 650 S.E.2d 819, 821 (2007) *aff'd*, 363 N.C. 364, 677 S.E.2d 452 (2009) (citations omitted). "[I]t is the duty of the trial court to charge the law applicable to the substantive features of the case arising on the evidence." *Blum v. Worley*, 121 N.C. App. 166, 168, 465 S.E.2d 16, 18 (1995) (emphasis deleted). "Once a party has aptly tendered a request for a specific instruction, correct in itself and supported by the evidence, failure of the trial court to render such instruction, in substance at least, is error." *Id*. (citations omitted).

### B.  Failure to Give Director Safe Harbor Jury Instruction

Rice testified that Brannon's role in Neogence, as an outside and non-officer director, was "[m]ostly as a friend and advisor, basically a cheerleader," and to "expos[e] th[e] company to friends that may want to invest in it."  Brannon did not have a day-to-day or any hands-on executive officer role in the company, which was run by Cummings, the Chief Operating Officer, Kirkbride, the Chief Financial Officer and a licensed attorney, and Rice, the founder and Chief Executive Officer.  According to Rice, Cummings was "part of [Neogence's] management team" and was "focused on sales and business development."

As Brannon asserted in his Answer, Piazza and Lampuri were both accredited, or "angel," investors.  The Securities Exchange Act of 1933 defines the term "accredited investor" to include, among others, any person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase

3

exceeds $1,000,000.00. 17 C.F.R. § 230.501(a).  The Act further defines an "accredited investor" as any person who had an individual income in excess of $200,000.00 or a joint income in excess of $300,000.00 with that person's spouse, in each of the two most recent years. *Id.*

Black's Law Dictionary defines an "angel investor" as "an experienced and successful entrepreneur, professional, or entity that provides start-up or growth financing to a promising company, often together with advice and contacts." BLACK'S LAW DICTIONARY (9th ed. 2009).  Both these sources describe an "accredited" or "angel investor" as a high net worth and high income individual, who understands, accepts, and undertakes high risks, which may result in high returns from highly speculative investments.  This status provides investors with lower suitability requirements than non-accredited, or non-angel, investors.  Brannon, an outside director of Neogence, was found liable to the accredited investors for repeating the first-hand information provided to him by Cummings, an executive officer of Neogence, about the Verizon opportunity.

The applicability of the Director Safe Harbor provision in the North Carolina Business Corporation Act to an outside director, who is alleged to be liable under the North Carolina Securities Act appears to be an issue of first impression in North Carolina.  This Court looks to decisions of both the federal courts and sister jurisdictions for guidance on issues of first impression, particularly where dealing

with Model or Uniform Acts. *See, e.g.*, *Cook v. Wake Cnty. Hosp. Sys.*, 125 N.C. App. 618, 623, 482 S.E.2d 546, 550 (1997).

The Fourth Circuit's analysis and holding in *Dellastatious v. Williams*, 242 F.3d 191 (2001) is together instructive and applicable to this case. In *Dellastatious*, the United States Court of Appeals for the Fourth Circuit applied Virginia's Director Safe Harbor statute to the Virginia Securities Act. The defendants were both outside directors of LaserVision Technologies, Inc. ("LaserVision"). The president of LaserVision invited the plaintiff, Dellastatious, to become an equity investor in Surround Vision Advanced Imaging, Inc. ("SAIL"), a limited liability company formed by LaserVision to finance the marketing of LaserVision's technology. *Id.* at 193.

In reaching his decision to invest, the plaintiff asserted he relied upon an Offering Memorandum prepared by the president of LaserVision, LaserVision's attorney, and two officers of SAIL. *Id.* SAIL ceased operations shortly thereafter.

Dellastatious and another shareholder included the two outside directors of LaserVision as defendants in a lawsuit and alleged the Offering Memorandum was materially misleading. *Id.* The plaintiff alleged the defendants, although not directly liable for the securities fraud, were liable as "control persons," and subject to liability under both the federal Securities Exchange Act of 1934 and the Virginia Securities Act. *Id.* at 194.

*TYSON, J., concurring in part, dissenting in part.*

Dellastatious appealed to the United States Court of Appeals for the Fourth Circuit from the district court's grant of summary judgment in favor of and dismissing the defendant directors. *Id.* The Court of Appeals presumed, without deciding, the defendants were "control persons" under federal and Virginia law. *Id.* at 195 (citing 15 U.S.C. § 78t(a) (extending liability to "every person who, directly or indirectly, controls" one liable for securities violations); Va. Code § 13.1-522(C) (extending liability to "every person who directly or indirectly controls" one liable for securities violations, "including every partner, officer, or director of such a person")).

Similar to the provisions of the North Carolina Securities Act, a "control person" can avoid liability under the Virginia Securities Act by proving that he "did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* at 194 (quoting Va. Code § 13.1-522(C)); *compare* N.C. Gen. Stat. § 78A-56(a)(2).

The Court of Appeals explained:

> One way to determine whether [the defendants] acted with "reasonable care" pursuant to Va. Code § 13.1-522(C), *is to consider whether they complied with the duties established for directors under state law.* Virginia Code § 13.1-690 establishes "the standard by which to evaluate a director's discharge of duties in Virginia." *Willard v. Moneta Bldg. Supply, Inc.*, 258 Va. 140, 515 S.E.2d 277, 284 (Va. 1999). If a director acts in accordance with that standard, Va. Code § 13.1-690(C) provides *a "safe harbor" that shields a director from liability "for any action taken as a director, or any failure to take any action."* Va. Code § 13.1-690(C); *see also Willard*, 515 S.E.2d at 284 (discussing § 13.1-690(C)'s

> safe harbor provision); *WLR Foods, Inc. v. Tyson Foods, Inc.*, 65 F.3d 1172, 1183 (4th Cir. 1995) (same). Although the few cases interpreting section 13.1-690 have concerned protections afforded directors under the business judgment rule, *the statutory text is in no way limited to that.* In light of 13.1-690(C)'s *expansive* safe harbor provision, it seems unlikely that section 13.1-522(C) would hold directors to a higher standard of care than that set forth under section 13.1-690.

*Id.* at 195-96 (emphasis supplied).

Here, Brannon's counsel requested North Carolina Civil Pattern Jury Instruction 807.50, which tracks the language of the Director Safe Harbor statute, N.C. Gen. Stat. § 55-8-30.  The statute reads:

> (a) A director shall discharge his duties as a director, including his duties as a member of a committee:
> > (1) In good faith;
> > (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
> > (3) In a manner he reasonably believes to be in the best interests of the corporation.
>
> (b) In discharging his duties *a director is entitled to rely on information, opinions, reports, or statements*, including financial statements and other financial data, if prepared or presented by:
> > (1) *One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;*
> > (2) *Legal counsel*, public accountants, *or other persons as to matters the director reasonably believes are within their professional or expert competence*; or

> (3) A committee of the board of directors of which he is not a member if the director reasonably believes the committee merits confidence.

> (c) A director is not entitled to the benefit of subsection (b) if he has actual knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (b) unwarranted.

> (d) A director *is not liable* for *any action taken as a director*, or any failure to take any action, if he performed the duties of his office in compliance with this section. The duties of a director weighing a change of control situation shall not be any different, nor the standard of care any higher, than otherwise provided in this section.

N.C. Gen. Stat. § 55-8-30 (emphasis supplied). This statute permits and encourages a director to serve the board for the corporation and communicate statements he received without fear of "being judicially second-guessed." *HAJMM,* 94 N.C. App. at 10, 379 S.E.2d at 873.

For comparison, the Virginia safe harbor statute interpreted by the Court of Appeals in *Dellastatious* reads:

> A. A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.

> B. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

*TYSON, J., concurring in part, dissenting in part.*

> 1. *One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented*;
>
> 2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or
>
> 3. A committee of the board of directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.
>
> C. *A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.*
>
> D. A person alleging a violation of this section has the burden of proving the violation.

Va. Code § 13.1-690 (emphasis supplied). The statutory schemes in both states are almost identical.

The *Dellastatious* Court determined summary judgment was properly granted in favor of the defendant outside directors to be dismissed from the plaintiffs' claim under the anti-fraud statute. *Id*. at 197. The directors complied with Virginia's standards for directorial duties, and they likewise acted with reasonable care under § 13.1-690(B), the safe harbor provision. *Id*. They served as outside directors on LaserVision's board, because they had invested $2.2 million of their own money in LaserVision, as Brannon had invested his own money in Neogence. *Id*. at 196.

Also like Brannon, these outside directors were not experts on the LaserVision technology and had no role in SAIL's plan to market the technology. *Id*. at 196-97. It

was reasonable for the directors to delegate the creation and review of SAIL's offering documents to SAIL's officers and attorney. *Id.* By virtue of their positions or areas of expertise, the officers, like the executive officers Rice, Kirkbride and Cummings for Neogence, were far more intimately involved with the production of the offering presentations, statements, and documents.

The majority's opinion offers the notion that Brannon has waived his right to assert the protections afforded to him under the Director Safe Harbor statute, because he failed to raise the issue as an "affirmative defense." The North Carolina Rules of Civil Procedure govern the pleading requirements for an affirmative defense.

> In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, truth in actions for defamation, usury, waiver, and any other matter constituting an avoidance or affirmative defense.

N.C. Gen. Stat. § 1A-1, Rule 8(c) (2015).

The Director Safe Harbor provision is not included in the extensive list of affirmative defenses set forth in Rule 8(c). No authority shows a director's assertion of the protection he is afforded under N.C Gen. Stat. § 55-8-30 must be specifically pled as an affirmative defense, nor was this issue raised by Plaintiffs either at trial, or upon Brannon's request for the instruction. The parties do not dispute that

Brannon was an independent, outside director of Neogence and the statements he made to Plaintiffs were merely a repetition of what he was told by Cummings.

The requested jury instruction must be given whenever "more than a scintilla of evidence" is introduced in support. *Blum*, 121 N.C. App. at 169, 465 S.E.2d at 18 (reversing trial court for failure to issue punitive damages instruction that was supported by "more than a scintilla" of evidence).

Contrary to Plaintiffs' and the majority opinion's assertion, evidence was presented to the jury to show Brannon completely relied upon Cummings' statements about the meeting in New York in making the alleged representation. Plaintiffs' counsel read into evidence Brannon's deposition testimony, in which he explained that he relied on Cummings in repeating information about the Verizon opportunity to both Plaintiffs:

> Q: Okay. And you indicated that there was an opportunity to be the featured augmented reality on Verizon applications; is that correct?
>
> A: That's what John Cummings told David Kirkbride, myself, Robert Rice, and I think Larry [Piazza] as well.
>
> Q: Okay. You would not agree that these e-mails were made in the context of seeking an investment in the company?
>
> A: This is to show information to make a decision.
>
> Q: To make what decision?

11

A: How we're going. How the place is going. Its first 50,000. How we're progressing. John [Cummings] was the marketer guy and the – again, he was the one that had the Verizon connection that had the meeting.

Q: Do you know whether John Cummings actually met with somebody at Verizon?

A: He said he did.

Q: Okay. And you simply took his word for it?

A: Yes.

Q: And you took his word for the fact that your company, Neogence, had an opportunity to become the featured augmented reality on Verizon applications?

A: Yes, I did. And that's why my e-mail said Robert [Rice] have [sic] all the details and John [Cummings] have all the details.

Q: You have no personal idea as to whether any such representation was made to John Cummings by anyone from Verizon?

A: No, sir.

Plaintiffs argue that even if the Safe Harbor provision applies, Brannon was acting unilaterally and not as a director. Plaintiffs argue an individual director has no legal authority to act on behalf of the corporation; rather, that authority resides exclusively in the entire board of directors, in whom the management of the affairs of the corporation is entrusted. N.C. Gen. Stat. § 55-8-01 (2015). This assertion is without merit.

*TYSON, J., concurring in part, dissenting in part.*

Everyone agrees Neogence required additional funds immediately to capitalize on the Verizon opportunity, and that this was the sole reason for Brannon's efforts to secure financing. While Plaintiffs argue Brannon was not acting as a director when soliciting investments for Neogence, neither they nor the majority suggests *any reasonable explanation whatsoever* to show why Brannon would otherwise solicit equity angel investments for the company.

To require every communication a director has with a third party to be formally approved in advance by the Board or to be made by the Board as a whole is unreasonable. Like most high risk start-up companies, the mission of Neogence was to raise funds to develop a working model to meet the Verizon demonstration deadline. Every solicitation and communication (email, phone call, etc.) in furtherance of the company's stated goal cannot reasonably require prior formal approval by the Board. Contrary to Plaintiffs' assertion, Brannon was acting as a "director" when he made the statement to Plaintiffs and the evidence shows he is entitled to the Director Safe Harbor jury instruction.

The majority's unnecessarily restrictive reading of the Safe Harbor provision will discourage qualified persons from agreeing to serve as unpaid, independent outside directors for corporate governance. If a director, particularly an independent outsider, cannot rely upon the statements of company employees, officers, and

13

*TYSON, J., concurring in part, dissenting in part.*

consultants in soliciting funds without being subject to securities fraud liability the majority imposes here, there is little incentive to serve at all.

It is undisputed that one of Brannon's roles as a non-officer, outside, independent director in the company was to recruit investors. It is also undisputed that his *sole* means of recruiting investors was to rely upon information provided by and statements made by Neogence employees, Cummings, Rice and Kirkbride, whose roles as executive officers were to create opportunities, disseminate information, and market the company. Brannon's requested Director Safe Harbor instruction is clearly supported by the evidence. The trial court committed reversible error by failing to provide the requested Director Safe Harbor instructions to the jury. *Blum*, 121 N.C. App. at 169, 465 S.E.2d at 18.

## II. Inconsistent Verdicts

Brannon was found liable to both Piazza and Lampuri under the provision of the North Carolina Securities Act, which provides:

> (a) Any person who:
>
> .　.　.　.
>
> (2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or

*TYSON, J., concurring in part, dissenting in part.*

> omission, is liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security . . . .

N.C. Gen. Stat. § 78A-56(a)(2) (2015).

### A.  Standard of Review

Whether Brannon should have been granted a new trial because the verdicts were inconsistent is reviewed for an abuse of discretion. *Seaman v. McQueen*, 51 N.C. App. 500, 505, 277 S.E.2d 118, 121 (1981) (citation and quotation marks omitted).

### B.  Statements to Piazza

### 1.  Brannon's Statements to Piazza

Brannon and Piazza had been personal and professional friends since they attended medical school as classmates in the 1980's.  The record shows and Piazza considers himself to be a high risk and qualified "angel investor."  Piazza was heavily involved in Neogence as an investor/creditor prior to when the Verizon opportunity arose.  Rice, founder and CEO of Neogence, had previously requested Piazza to serve the company as an "advisory board member" due to his "professional qualifications" and "expertise."

Piazza initially learned of Neogence from Brannon in January 2010.  The following month, Piazza invested $50,000.00 in the company.  Piazza raises no issues with regard to his initial $50,000.00 investment.  Following Piazza's initial

investment, Rice testified Piazza expressed interest in increasing his equity stake in the company.

According to Rice, Piazza wanted to be "kept up to date on what we were doing," "who we were talking to," and "what risks we were looking at." Because of Piazza's established investments, membership on the board, tolerance for risks, and interest in further investing in Neogence, he was often copied on internal communications within the company.

Brannon testified in his deposition that "[Piazza] and all these people want to know how the Verizon meeting went, and this is what I got back was this information [from Cummings]." From what Cummings told him, Brannon believed Neogence had the opportunity to become the featured alternate reality application on Verizon phones.

On 30 April 2010, Piazza received the email from Brannon that is the subject of this litigation. The email was also sent to Kirkbride, Rice, and others. Brannon did not send the email to Lampuri. The email states in its entirety:

> Guys John Cummings just had a meeting in NY with Verizon. We need $100-200K ASAP, in 3-4 weeks we go back to Verizon we have an oppurtnity [sic] to be their featured AR. Rob is going to send out a summary later today. I know all of you are BUSY!!! I need you to give a few minutes to look at this potential. THANK YOU for your TRUST!! Greg

16

*TYSON, J., concurring in part, dissenting in part.*

Brannon immediately urged Piazza to speak with Cummings directly about the Verizon opportunity. On 1 May 2010, the following day, Piazza called Cummings. Cummings stated to Piazza that he had met with the Verizon executive of new technologies the day before and Neogence had "an amazing opportunity to be on every Verizon Droid phone." Piazza testified there was no differences between Brannon's and Cummings' statements to him. Piazza also independently spoke a few days later with David Kirkbride, the CFO and licensed attorney, who "described [the] identical situation" as Brannon and Cummings.

Brannon and Piazza spoke on the telephone numerous times between the time the April 30th email was sent and 28 May 2010, the day Piazza made his $150,000.00 additional investment. Evidence shows Brannon described the opportunity each time consistently with the initial email and Cummings' statements.

Cummings and Kirkbride traveled to Maine without Brannon to meet face-to-face with Piazza and further discuss the Verizon opportunity. Testimony shows they "reiterated the same opportunity." Piazza invested an additional $150,000.00 in Neogence two days after this meeting in Maine. Both Piazza and Lampuri made the investments at issue *only* after face-to-face meetings with Cummings, without Brannon's presence, during which Cummings specifically described the opportunity to be a featured application on Verizon phones.

### 2. Rice's Statements to Piazza

*TYSON, J., concurring in part, dissenting in part.*

Piazza and Rice had met through Brannon about fifteen years before this controversy arose. Cummings told Rice about the Verizon meeting in New York. According to Rice, Cummings told him Neogence had the opportunity to "go back to Verizon" in three to four weeks, demonstrate their technology, and possibly become a featured alternate reality application on Verizon phones. Like Brannon, Rice understood that Verizon had invited Neogence to present a functioning demonstration of Mirascape's capabilities directly to Verizon.

Rice sent an email to Piazza, Brannon, and others on 30 April 2010 at 7:14 p.m., less than two hours after Brannon's email set out above was sent to Piazza. Rice testified his email was sent "in reference to Brannon's [earlier] email." Rice testified he communicated everything Cummings had told him about the meeting in New York in this email. Cummings was the only person to whom Rice had spoken about the meeting in New York. The record shows Rice's email contained "exactly" what Cummings told him, and explains Cummings' meeting with McGarry Bowen and the director of new technologies at Verizon in New York. The email states:

> Verizon responded extremely well to this and asked how we differentiate ourselves from others like Layar. The answer, simply put, is that we are focusing on empowering the user to create content, as well as building a vibrant virtual goods marketplace, again centered on the user.
>
> . . . .
>
> While we have been seeking $200k in additional angel funding to meet our milestones and deliverables June for

18

Allied and July for a public beta launch), we now have an opportunity to go back to Verizon in about three weeks to blow their minds with a demo that shows everything we are doing with Allied, as well as all of the earthmark stuff (and some of the early social marketplace functionality). *The opportunity here is to become the featured AR application for Verizon, OEM'd on all of the DROID smartmobiles*, and leverage their marketing. Even bigger, if we can pull this off with Verizon, it puts us squarely in the limelight of catching the eyes of other Fortune 100 companies for marketing, promotions, and strategic partnerships.

The challenge here, is that we have to jump to warp speed to accelerate development . . . not only to meet our milestones, but to WOW Verizon. This is a one-shot opportunity. As things currently are, we are crawling along to meeting the milestones, but there is no way we can deliver the perfect demo for Verizon without immediate funding. I need resources to bring on additional developers as a strike team to do this fast, hard, and well. Not only do we need to take the app and the website to the next level, but we need to make it look fantastic, as well as the actual demo/presentation . . . This is a huge chance and opportunity, but we can't do it alone. We need help finding additional angel capital that can make a decision and move quickly.

(emphasis supplied).

On 3 May 2010, Rice sent an email to Piazza, Cummings, Kirkbride, and Brannon, which discusses the timeline for preparation of the demo and the need for immediate additional funding. Rice sent another email to the identical group on 6 May 2010, which provides a breakdown of milestones for the development team and stated he would "like to close" $200,000.00 in funding before the end of the month.

*TYSON, J., concurring in part, dissenting in part.*

On 11 May 2010, Rice sent an email to Piazza stating a target date for the demo as 4 June 2010.

Rice emailed Piazza again on 25 May 2010, and stated, "I'll do whatever it takes to get you on board[,]" and "I can't move this company forward without you." According to Rice, Piazza asked him numerous times what would happen "if we don't do Verizon." Rice told Piazza there were many other opportunities and "Verizon is one path among many." All these communications and events occurred prior to Piazza's additional investment in Neogence that is the subject of this litigation. There are no facts or evidence whatsoever to support a finding or conclusion that Brannon defrauded Piazza and Rice did not.

### 3. Jury Verdicts on Piazza's Claims

Both Rice and Brannon relied upon Cummings, the Chief Operating Officer of Neogence, as their source of first-hand information about the Verizon meeting and basis of the opportunity. It is undisputed from the testimony and transcript that Brannon and Rice repeated *exactly the same* information to the angel investors, which both had received from Cummings. It is also undisputed that statements Brannon made in follow-up conversations with Piazza were consistent with the statement in his original 30 April 2010 email to Piazza.

Issues 1 and 5 on the jury's completed verdict form state:

*TYSON, J., concurring in part, dissenting in part.*

ISSUE 1:

Did Defendant, Gregory Brannon, in soliciting the Plaintiff Lawrence Piazza, to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiff, Lawrence Piazza, was unaware of the true or omitted facts?

ANSWER:  YES

.  .  .  .

ISSUE 5:

Did Defendant, Robert Rice, in soliciting the Plaintiff Lawrence Piazza, to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiff, Lawrence Piazza, was unaware of the true or omitted facts?

ANSWER:  NO

If Rice's 30 April 2010 email was not materially false or misleading, then Brannon's 30 April 2010 email, sent less than two hours earlier with statements entirely consistent with Rice's email and based upon the same source, could not be materially false or misleading.  Under Rule 59 of the Rules of Civil Procedure, a new trial may be granted based upon, *inter alia*, "[a]ny irregularity by which any party was prevented from having a fair trial," or "[a]ny other reason heretofore recognized

21

as grounds for new trial." N.C. Gen. Stat. § 1A-1, Rule 59(a)(1) and (9) (2015).  Where a jury's answers to issues "are so contradictory as to invalidate the judgment, the practice of the Court is to grant a new trial . . . because of the evident confusion." *Palmer v. Jennette*, 227 N.C. 377, 379, 42 S.E.2d 345, 347 (1947) (citation omitted).

The majority's opinion focuses on Defendants' burden of proof, and states, "[a] jury verdict imposing liability on one of two defendants in an action is not a 'miscarriage of justice' when one defendant testifies to the benefit of his reasonable care defense and the other defendant remains silent and fails to carry his burden." However, issues 1 and 5 submitted to the jury do not concern Defendants' burden of proof.  These issues pertain *solely* to whether the statements of Rice and Brannon to Piazza were materially false or misleading.

There is simply no evidence in the record and before the jury to support the verdict finding that "the Plaintiff, Lawrence Piazza, was unaware of the true or omitted facts(,)" to acquit Rice and convict Brannon of securities fraud.  The trial court abused its discretion in denying Brannon a new trial, where the statements Brannon and Rice made to Piazza were identical and communicated to Piazza within two hours of each other.  On this ground, I also vote to grant a new trial on Brannon's liability to Piazza.

## B.  Statements to Lampuri

### 1.  Brannon's Statement's to Lampuri

*TYSON, J., concurring in part, dissenting in part.*

The background and knowledge of Piazza and Lampuri are different. Lampuri first learned about Neogence from Brannon in February of 2010 during Lampuri's wife's prenatal visit to Brannon's medical office. Brannon did not send an email to Lampuri. Brannon allegedly made the statement to Lampuri on 25 May 2010, during another of his wife's pre-natal visits to Brannon's office.

Lampuri testified Brannon told him, "our director of sales just got back from New York City at a meeting. There were Verizon executives there, and they were absolutely blown away by our technology" and Neogence needed to create a functioning demonstration of Mirascape to show Verizon. According to Lampuri, Brannon stated, "[t]hey're going [to be] pre-installed on all Verizon phones."

As with Piazza, Brannon urged Lampuri to call Robert Rice or John Cummings to discuss the opportunity. Lampuri met personally with Cummings, Kirkbride and Rice in July of 2010. The last time Brannon spoke with Lampuri about the Verizon opportunity was 25 May 2010. Lampuri did not invest in the company until September 2010, and *only* then after face-to-face meetings with the officers of Neogence without Brannon present.

### 2. Rice's Statements to Lampuri

During the July 2010 meeting, Cummings assumed the lead role in the presentation to Lampuri, and said the "exact same thing" that Brannon had told him about Verizon. According to Cummings, Neogence had the opportunity to be a pre-

loaded application on all Verizon Droid phones. Rice reiterated "the deal was very much real. It was a real opportunity." Rice stated "the funds that they were seeking were to get this demo up and doing – up and coming to show Verizon." Lampuri met with Cummings and Rice again, without Brannon, on a later date. Cummings told him "the exact same thing" and Rice reiterated that "the deal was very much real."

### 3. Jury Verdicts on Lampuri's Claims

I concur with the majority opinion's holding that Brannon has failed to meet the high burden on appeal to show the trial court abused its discretion by denying Brannon a new trial based upon the inconsistent jury's verdicts on Lampuri's claims. While reasonable minds may differ and easily reach a contrary conclusion, Brannon has failed to show these inconsistencies between the verdicts against him and in favor of Rice on Lampuri's claims arise to show an abuse of discretion.

Unlike Brannon, the record does not show Rice made any direct statements to Lampuri, other than to reiterate Cummings' statements by declaring the opportunity was "very much real." The statements made by Brannon and Rice to Lampuri contain sufficient dissimilarities to preclude a finding of abuse of discretion to award a new trial on the ground of inconsistent verdicts on Lampuri's claims.

### III. Conclusion

The trial court erred by refusing to provide Brannon's requested Director Safe Harbor jury instruction on both Plaintiffs' claims, which was supported by the

evidence. Plaintiffs failed to offer any evidence to show Brannon was not acting as a director at all times he communicated with Plaintiffs and he was not otherwise entitled to the Director Safe Harbor instruction.

The instruction is warranted where evidence tends to show the director relied upon statements, presentations, and business data, even though the plaintiffs may have suffered investment losses. The director's reliance must be in good faith and reasonable. Here, there is no evidence to the contrary. Whether an outside, independent, and non-compensated director can rely upon corporate information received from the executive officers and be protected by N.C. Gen. Stat. § 55-8-30(d) is a question of fact, which must be supported by the evidence and found by the jury after a proper Director Safe Harbor instruction from the trial court.

"[I]t is the duty of the trial court to charge the law applicable to the substantive features of the case arising on the evidence." *Blum*, 121 N.C. App. at 168, 465 S.E.2d at 18. "Once a party has aptly tendered a request for a specific instruction, correct in itself and supported by the evidence, failure of the trial court to render such instruction, in substance at least, is error." *Id.* (citations omitted). Brannon is entitled to a new trial against both Plaintiffs due to the trial court's failure to provide the requested instruction.

The trial court also abused its discretion in denying Brannon a new trial, where the statements Brannon and Rice made to Piazza were identical in time and content,

*TYSON, J., concurring in part, dissenting in part.*

which renders the verdicts holding Brannon liable to Piazza and absolving Rice of liability "so contradictory as to invalidate the judgment." *Palmer,* 227 N.C. at 379, 42 S.E.2d at 347. I concur with the majority opinion's holding that Brannon failed to meet the high burden on appeal show the trial court abused its discretion by denying Brannon a new trial based upon the jury's apparently inconsistent verdicts on Lampuri's claims against Brannon and Rice.

As I vote to award a new trial on multiple and alternate grounds, the trial court's award of attorney fees and court costs must also be reversed. I respectfully concur in part and dissent in part.